**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE :

APPLICATION UNDER 28 U.S.C. § 1782 TO
TAKE DISCOVERY FROM BROOKFIELD
INFRASTRUCTURE PARTNERS L.P.,
BROOKFIELD ASSET MANAGEMENT
LTD., BROOKFIELD CORPORATION,
CAHILL GORDON & REINDEL LLP, KPMG
LLP, THE BANK OF NOVA SCOTIA,
SCOTIA CAPITAL (USA) INC., SCOTIA
HOLDINGS (USA) LLC, ARUP LATIN
AMERICA S.A., ARUP AMERICAS, INC.,
CITIBANK, N.A., WELLS FARGO, N.A.,
JPMORGAN CHASE & CO., THE CLEARING
HOUSE PAYMENTS COMPANY L.L.C.,
AND THE FEDERAL RESERVE BANK OF
NEW YORK

Case No. 1:24-mc-00533

**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION UNDER 28 U.S.C. § 1782**
**AUTHORIZING APPLICANT TO CONDUCT DISCOVERY**
**IN THIS DISTRICT FOR USE IN FOREIGN PROCEEDINGS**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

   I.   Odebrecht's History of Corruption ....................................................................... 2

   II.   Odebrecht Bribes MML Officials to Obtain the Concession Contract ................ 4

      A.   Odebrecht Bribes the City Council ........................................................... 4

      B.   Odebrecht Repeatedly Bribes Villarán ...................................................... 5

      C.   Odebrecht Hedges Its Bets, Bribing Villarán's Opponent Luis Castañeda ............... 8

      D.   Brookfield Infrastructure Acquires Rutas from Odebrecht ........................ 9

   III.   Brookfield Regularly Acquires Companies Accused of Fraud and Corruption ............... 12

   IV.   Four Actual and Contemplated Criminal Proceedings Target Odebrecht and Brookfield Corruption and Misconduct in Peru ................................................. 14

   V.   The MML Seeks Discovery for Use in Peruvian Criminal Proceedings ........................... 17

      A.   Discovery Relating to Brookfield Infrastructure's Acquisition and Operation of Rutas ................................................................................. 18

      B.   Discovery Aimed at Exposing Corruption of Former MML Officials and the Concession Contract ............................................................................. 22

ARGUMENT ................................................................................................................... 26

   I.   The Application Meets Each of the Statutory Requirements for Discovery .................... 26

      A.   The Discovery Subjects Reside or Are Found in the Southern District of New York ............................................................................................. 27

      B.   The Requested Discovery Is Sought for Use in Peruvian Criminal Proceedings .... 32

      C.   The MML Is an "Interested Person" in the Peruvian Criminal Proceedings ........... 35

   II.   Each of the Discretion Factors Weighs Strongly in Favor of Granting the Application ... 38

      A.   The Discovery Subjects Are Not Participating in the Criminal Proceedings or Contemplated Criminal Proceeding ......................................................... 39

      B.   The Nature of the Court, the Character of the Proceeding, and the Receptivity of the Court Support Granting the Discovery Requested ............................. 40

      C.   The MML Does Not Seek to Circumvent Proof-Gathering Restrictions or Other Policies ................................................................................... 42

      D.   The Requested Discovery Is Narrowly Tailored, and Is Not Unduly Intrusive or Burdensome ......................................................................... 42

CONCLUSION ................................................................................................................ 44

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                            **Page(s)**

*In re Republic of Kazakhstan for an Ord. Directing Discovery from Clyde & Co. LLP Pursuant to 28 U.S.C. sec. 1782,*
    110 F. Supp. 3d 512 (S.D.N.Y. 2015) ........................................................................ 38

*In re Application of Shervin Pishevar for an Ord. to take Discovery for use in Foreign Proc. Pursuant to 28 U.S.C. § 1782,*
    439 F. Supp. 3d 290 (S.D.N.Y. 2020) ........................................................................ 37

*In re Aguila Energia e Participacoes Ltda.,*
    2023 WL 7001445 (S.D.N.Y. Aug. 22, 2023) ............................................................ 43

*In re Zarzur,*
    No. 22 MISC. 348 (AT), 2024 WL 81517 (S.D.N.Y. Jan. 8, 2024) .......................... 31

*In re Golden Meditech Holdings Ltd.,*
    No. 24 MISC. 24 (DEH), 2024 WL 1349135 (S.D.N.Y. Mar. 29, 2024) ................. 30, 31

*Actions Pending in the Norway,*
    249 F.R.D. 96 (S.D.N.Y. 2008) ................................................................................. 42

*Brandi-Dohrn v. IKB Deutsche Industriebank AG,*
    673 F.3d 76 (2d Cir. 2012) ......................................................................................... 43

*Campos-Alvarez v. Newmont Mining Corp.,*
    No. 1:14-CV-00208-REB, 2015 WL 1228262 (D. Colo. Mar. 16, 2015) ................ 44

*CFE International LLC v. Denham Capital Management LP,*
    No. 22-MC-91355-FDS, 2023 WL 2988745 (D. Mass. Mar. 6, 2023) .................... 37

*Consorcio Minero S.A. v. Doe Run Res. Corp.,*
    No. 4:11-MC-583 CEJ, 2011 WL 4550200 (E.D. Mo. Sept. 30, 2011) .................. 44

*Crown Prosecution Serv. of United Kingdom,*
    870 F.2d 686 (D.C. Cir. 1989) .................................................................................. 39

*Euromepa S.A. v. R. Esmerian, Inc.,*
    51 F.3d 1095 (2d Cir. 1995) ...................................................................................... 43

*Evenstar Master Sub-Fund I Segregated Porftfolio,*
    No. 20MISC00418CSJCM, 2021 WL 3829991 (S.D.N.Y. Aug. 27, 2021) ........ 43, 47

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
    592 U.S. 351 (2021) ............................................................................................ 30, 32

**Page(s)**

*Gasolinera Petroleos Venezuela S. de R.L.*,
No. 08-20378-MC, 2011 WL 181311 (S.D. Fla. Jan. 19, 2011) ................................................. 47

*In re Application of Chevron Corp.*,
709 F. Supp. 2d 283 (S.D.N.Y. 2008) ............................................................................. 42

*In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf*,
No. Civ. M19-88 (BSJ), 2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006) .................................... 45

*In re Application of Grupo Qumma*,
No. M 8-85, 2005 WL 937486 (S.D.N.Y. Apr. 22, 2005) ......................................................... 41

*In re Application of Hill*,
No. 05CV999996, 2007 WL 1226141 (S.D.N.Y. Apr. 23, 2007) .............................................. 45

*In re Application of Michael Wilson & Partners*,
No. 06-cv-02575-MSK-KMT, 2009 WL 1193874 (D. Colo. Apr. 30, 2009) ......................... 46

*In re B&C KB Holding GmbH*,
No. 22-MC-00180 (LAK) (VF), 2023 WL 1777326 (S.D.N.Y. Feb. 6, 2023) ................ 35, 37

*In re B&C KB Holding GmbH*,
No. 23-1014, 2024 WL 3170983 (2d Cir. June 26, 2024) ......................................................... 37

*In re del Valle Ruiz*,
939 F.3d 520 (2d Cir. 2019) ................................................................................ 30, 31, 32

*In re Golden Meditech Holdings Limited*,
No. 24 MISC. 24 ................................................................................................ 30, 31

*In re Kuwait Ports Authority*,
No. 1:20-MC-00046-ALC, 2021 WL 5909999 (S.D.N.Y. Dec. 13, 2021) ............................ 31

*In re Litasco SA*,
No. 23-MC-354, 2023 WL 8700957 (S.D.N.Y. Dec. 15, 2023) ................................................ 30

*In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*,
539 F.2d 1216 (9th Cir. 1976) ............................................................................................... 47

*In re Mangouras*,
No. 17-MC-172, 2017 WL 4990655 (S.D.N.Y. Oct. 30, 2017) ................................................ 45

*In re Republic of Ecuador*,
No. C-10-80225 MISC CRB, 2010 WL 4973492 (N.D. Cal. Dec. 1, 2010) .......................... 38

iii

**Page(s)**

*In re Rodriguez Guillen*,
No. 20-MC-102 (ALC), 2020 WL 3497002 (S.D.N.Y. June 29, 2020) .................................. 37

*In re Vinmar Overseas, Ltd.*,
No. 20-MC-277 (RA), 2020 WL 4676652 (S.D.N.Y. Aug. 12, 2020) ............................. 31, 42

*In re Wilhelm*,
470 F. Supp. 2d 409 (S.D.N.Y. 2007) ......................................................................... 36

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ............................................................................................... *passim*

*Matter of Governmentt of Mongolia v. Itera International Energy, L.L.C.*,
No. 3:08-MC-46-J-32MCR, 2009 WL 10712603 (M.D. Fla. Nov. 10, 2009) ........................ 38

*Mees v. Buiter*,
793 F.3d 291 (2d Cir. 2015) ................................................................................... 36, 46

*ZF Auto. US, Inc. v. Luxshare, Ltd.*,
596 U.S. 619 (2022) ............................................................................................... 35, 36

**Statutes**
28 U.S.C § 1782 .................................................................................................... *passim*

**Other**
Fed. R. Civ. P. 26 ................................................................................................. *passim*

Fed. R. Civ. P. 45 ................................................................................................. *passim*

Fed. R. Civ. P. 30 ....................................................................................................... 47

## PRELIMINARY STATEMENT

The Metropolitan Municipality of Lima, Peru (the "MML")[1] seeks discovery under Section 1782 concerning a corrupt toll road project in Lima, Peru.  Among those involved are Brookfield Corporation, Brookfield Infrastructure Partners L.P. ("Brookfield Infrastructure"), and affiliated entities (together, "Brookfield").  Brookfield is a global investment company that regularly profits by acquiring companies and contracts that benefit from corrupt practices—including from Odebrecht S.A. ("Odebrecht"), a corrupt company that admitted to bribing public officials in Peru and elsewhere, and entered a plea agreement in December 2016 with the U.S. Department of Justice ("DOJ"), which the DOJ called the "largest foreign bribery case in history."  On at least six occasions in recent years, Brookfield has acquired tainted assets that "few others would touch due to the legal, political and economic risks involved."[2]

Brookfield's strategy included the purchase of Odebrecht's interest in Rutas de Lima S.A.C. ("Rutas"), a consortium operating a network of toll roads in Lima, in June 2016—six months before Odebrecht's U.S. $3.5 billion DOJ plea agreement.  Criminal investigations in Peru have established that Odebrecht obtained this contract (the "Concession Contract") by bribing MML government officials.  Given the timing, Brookfield was aware of the stakes involved pre-acquisition.  In the months leading up to the sale, the media reported on Odebrecht's worldwide corruption—including in Peru where the Peruvian government launched investigations into Odebrecht's businesses; and Odebrecht's then-CEO Marcelo Odebrecht was sentenced to 19 years

---

[1] The Metropolitan Municipality of Lima is the local government authority for the Lima Metropolitan Area and the city of Lima, the capital and largest city of Peru.  The MML is headed by the Mayor of Lima, who leads the municipal council, consisting of elected representatives responsible for making city-wide decisions, policies, and regulations. The MML handles tasks and services impacting the city of Lima as a whole, such as urban planning, major road and infrastructure projects, and public transportation systems.

[2] Tatiana Bautzer, *How Canada's Brookfield Snatched Bargain Assets Amid Brazil Panic*, REUTERS (May 21, 2018), https://www.reuters.com/article/world/how-canadas-brookfield-snatched-bargain-assets-amid-brazil-panic-idUSKCN1IM0EV/.

in prison for paying millions of dollars in bribes. Thus, after conducting cursory due diligence, Brookfield Infrastructure purchased Odebrecht's interest in Rutas. Brookfield remains the majority shareholder.

Meanwhile, government authorities in Peru have continued to uncover evidence of bribery underlying the Concession Contract. This has spawned multiple investigations, including of the former Mayor of Lima Susana Villarán de la Puente ("Villarán"), the former Peruvian President Pedro Pablo Kuczynski ("Kuczynski"), and a Peruvian affiliate of Brookfield: Brookfield Infrastructure Group Peru S.A.C. ("Brookfield Peru"). In September 2024, a Peruvian judge found that the case against Villarán meets the necessary legal and factual requirements to proceed to trial against her on corruption charges relating to the award of the Concession Contract.

The MML therefore respectfully files this application (the "Application") for judicial assistance under 28 U.S.C. § 1782(a) ("Section 1782") and Rules 26 and 45 of the Federal Rules of Civil Procedure. The discovery sought will support actual and contemplated criminal proceedings in Peru relating to the corrupt Concession Contract.

## FACTUAL BACKGROUND

### I.    Odebrecht's History of Corruption

Odebrecht is a Brazilian global industrial conglomerate. Ex.[3] 1 at ¶ 1. In 2014, Brazilian law enforcement uncovered Odebrecht's corruption scheme, spurring investigations into Odebrecht in the United States and other countries, including Peru. *Id.* at ¶¶ 65–67, 71. In the United States, Odebrecht ultimately entered into a plea agreement with the DOJ, admitting to having paid about U.S. $800 million in bribes to government officials in Peru and elsewhere for

---

[3] Unless specified otherwise, all references to exhibits refer to the exhibits in the Declaration of Scott Curtis Nielson.

public contracts.[4]  Ex. 1 at ¶¶ 19, 23, 65–67.  Odebrecht's bribery scheme began in about 2001, and its "secret financial structure" evolved in 2006 into its Division of Structured Operations—a "standalone" division that "effectively function[ed] as the bribe department within Odebrecht and its related entities" ("Bribe Department").  *Id.* at ¶¶ 2, 19, 21.  The Bribe Department maintained a "separate and off-book communications system" to coordinate its bribes and a ledger (i.e., spreadsheet) to track its bribes, using "codes and passwords" to "mask" the payments and recipients.  *Id.* at ¶¶ 21, 25.  Odebrecht generated these "unrecorded" funds through "a variety of methods," including by collecting "overcharges and fees that were attributed as legitimate to service providers and subcontractors but not included in project budgets."  *Id.* at ¶¶ 26–27.  The Bribe Department would then "funnel[]" the funds to beneficiaries through "offshore entities" and other intermediaries, passing through "layer[s]" of bank accounts along the way, and often paying bribes in cash.  *Id.* at ¶¶ 27–29, 44.  The payments recorded in the ledgers of the Bribe Department, which, to state the obvious, only made payments for illicit purposes, as payments from the Bribe Department were kept off the books of Odebrecht.  In other words, lawful payments would not be directed through the Bribe Department and recorded in its ledgers.

Odebrecht further admitted that "its employees and agents took a number of steps while in the territory of the United States in furtherance of the corrupt scheme," including conducting meetings in Miami, Florida, and transferring funds through New York-based bank accounts.  *Id.* at ¶¶ 4–6, 10, 22, 31.

---

[4] While the corrupt conduct detailed in Odebrecht's U.S. plea agreement is similar to the corrupt conduct engaged in by Rutas, that agreement neither explicitly referenced nor excluded corruption related to Rutas.

## II.    Odebrecht Bribes MML Officials to Obtain the Concession Contract

### A. Odebrecht Bribes the City Council

The Concession Contract has been tainted since its inception.[5]  In 2010, Odebrecht subsidiaries submitted an unsolicited proposal to build, operate, and maintain highways in Lima in exchange for the toll revenue.  Ex. 2 at ¶¶ 92, 98.  The proposal required approval from the relevant municipal department (called "GPIP"), and then from the City Council; GPIP did not approve it.  Ex. 3 at ¶ 12; Ex. 4 at ¶ 87.

On October 31, 2012, a recall election kicked off to remove Villarán from office.  Ex. 5 at 2.  On January 12, 2012, Villarán appointed José Miguel Castro Gutiérrez ("Castro") as the new Metropolitan Municipal Manager, the second highest municipal official.  Ex. 3 at ¶¶ 6, 8–9.[6]

On April 13, 2012, after "insistent[] request[s]" from members of Villarán's political party, Castro met with Odebrecht executives.  Ex. 3 at ¶ 9.  Odebrecht sought MML's approval of the proposal during the meeting.  *Id.* at ¶ 11.  Odebrecht executives told Castro that (once approved by GPIP) obtaining the City Council's approval "would not be a concern" because Odebrecht "had a very good relationship with the opposition councilors," and Odebrecht "would talk with them." *Id.* at ¶¶ 11–12, 15.  GPIP and the City Council both approved the proposal on May 3, 2012, with unanimous support from the opposition councilmembers who previously "had been completely opposed to all [of Villarán's] initiatives."  *Id.* at ¶¶ 14–15.  Odebrecht also secretly paid U.S.

---

[5] The information in Section II comes in part from information developed by Peruvian prosecutors and introduced into evidence at arbitration proceedings between the MML and Rutas, and in related proceedings in the U.S. District Court for the District of Columbia.  In the district court proceedings (Case Nos. 1:23-cv-00680-ACR (D.D.C.) and 1:20-cv-02155-ACR (D.D.C.)), the court confirmed arbitration awards in favor of Rutas against MML.  *Metro. Municipality of Lima v. Rutas de Lima S.A.C.*, No. 1:20-CV-02155 (ACR), 2024 WL 1071119, at *25 (D.D.C. Mar. 12, 2024).  The MML is currently appealing those decisions in the D.C. Circuit.  *See Met. Municipality of Lima v. Rutas De Lima S.A.C.*, Case No. 24-7053 (D.C. Cir.).

[6] Villarán also appointed Domingo Arzubialde Elorrieta ("Arzubialde") as the Manager of GPIP that year. Ex. 5 at 1. On February 20, 2019, Arzubialde was convicted for the crime of incompatible negotiation in connection with a concession contract involving another Brazilian construction company, OAS.  Ex. 77.  The conviction was affirmed on appeal.  *Id.* at 31–32.

$200,000 in cash to Lourdes Flores Nano, the leader of the opposition party, specifically to support its initiative. Ex. 7 at ¶ 71; Ex. 8 at ¶¶ 39–40; Ex. 10 at 3–4; Ex. 11 at 2–3. The proposal, worth about U.S. $500 million at the time, was awarded to Odebrecht without competition. Ex. 3 at ¶ 10.

### B. Odebrecht Repeatedly Bribes Villarán

Although Odebrecht was awarded the proposal, Odebrecht still needed to "negotiat[e] … the terms" of the Concession Contract and to obtain MML's approval for project financing. Ex. 3 at ¶ 19; Ex. 12 at ¶¶ 8, 12; Ex. 13 at 30–32; Ex. 4 at ¶¶ 637–40. Villaran's support remained necessary to securing the Concession Contract and its benefits. Odebrecht then incorporated Rutas as a subsidiary "to perform the highway project that is the subject of the [Concession] Contract." Ex. 14 at 4; Ex. 4 at ¶¶ 81–82, 89, 96–97.

On October 31, 2012, the national government announced that Villarán would be subject to a recall referendum on March 17, 2013. Ex. 4 at ¶ 374. Between November 2012 and January 2013, Castro, Jorge Henrique Simoes Barata ("Barata") (Odebrecht's lead for Peru and later Rutas's president), Antonio Eleuberto Martorelli (Executive of Odebrecht S.A.), and Raúl Pereira Neto ("Pereira") (Rutas's General Manager) met multiple times to discuss contributions to Villarán's recall campaign. Ex. 3 at ¶¶ 18–24; Ex. 15 at ¶¶ 1, 13–16; Ex. 13 at 14–15; Ex. 16 at 2–3; Ex. 11 at 3. Castro asked the Odebrecht/Rutas executives to contribute U.S. $3 million to Villarán's recall campaign, with U.S. $2 million to be paid directly to purported media consultants Luis Favre and Valdemir Garreta. Ex. 3 at ¶¶ 21, 24. Pereira was responsible for facilitating the illicit payments to the Villarán campaign. Ex. 13 at 14–15, 21–22, 37, 40–41; Ex. 17 at 2. At the time of these payments, Odebrecht didn't have any other significant business before MML other than its proposal that would later become the Concession Contract.

On January 8, 2013, Odebrecht made the down payment, the first of multiple payments, totaling U.S. $500,000 to Favre.  Ex. 15 at ¶ 20.  The next day, January 9, 2013, MML and Rutas signed the Concession Contract.  Ex. 2 at ¶ 97.  Villarán survived the recall vote on March 17, 2013.  Ex. 18.  She next faced reelection on October 5, 2014.  Ex. 19.

In August 2013, Pereira and Gerardo Sepúlveda ("Sepúlveda"), Rutas's purported financial advisor, met with Castro to "negotiat[e] … additional benefits [for Rutas] in exchange of funds for Villarán's political campaigns."  Ex. 3 at ¶¶ 28–34; Ex. 20 at 9130, 9133.  These benefits were implemented as the "Bankability Addendum," which increased the value of the Concession Contract by about 40%, or about U.S. $200 million—an "overvaluation of the contracted works." Ex. 3 at ¶ 33.  Three days after the August 2013 meeting, Pereira established an offshore account at the Banca Privada d'Andorra in the name of an MML official, Gabriel Prado Ramos ("Prado"), to channel payments to Villarán's re-election campaign.  Ex. 4 at ¶¶ 652–55, 671.  In a recorded phone call in which Prado, Villarán, and Castro discussed how to conceal their illegal activities, Prado said the "account in Andorra [was the] product of the bribes," and its "only objective" was "to hide dirty money."  Ex. 22 at 1.

On February 13, 2014, MML and Rutas executed the Bankability Addendum.  Ex. 2 at ¶ 104.  In May 2014, Odebrecht then initiated a year-long series of payments—through the Bribe Department—totaling U.S. $2 million to Favre and Garreta, purportedly to provide media consulting to Villarán's re-election campaign.  Ex. 15 at ¶ 3; Ex. 3 at ¶ 21.  Odebrecht documented ten payments worth millions it made using an encoded ledger that identified the recipients as Castro (codename: "Budián"), Villarán's campaign (codename: "Sexta-Feira"), or Villarán herself (codename: "Careca"), and identified the work as "Concession Rutas de Lima," "Vías Nuevas de Lima," or "Línea Azul"—all references to the Concession Contract.  Ex. 23 at 1102, 1104, 1167–

81, 1207–08; Ex. 24 at 0354–58, 0402–03, 0407–08, 0411; Ex. 25 at 1898–1913.  Castro admitted

these payments were "directly linked to the financial closure of the Rutas de Lima Concession, . . .

and the [Bankability] Addendum," Ex. 17 at 3, and that much of the "additional works" in the

Addendum were "overvalu[ed]" or "fictitious" projects designed to give "only [the] appearance"

of additional investment in Lima's infrastructure.  Ex. 20 at 9133.  The Bankability Addendum

was a kickback scheme, with the kickback financing Villarán's campaign.

Rutas issued sham subcontracts to funnel money to Villarán's campaign, such as the

subcontract with Generación S.A., owned by Cesar Meiggs Rojas ("Meiggs").  Ex. 26; Ex. 27; Ex.

28; Ex. 29 at 3.  Meiggs admitted that Generación's subcontracts—formed in August and October

of 2014, as the re-election vote was approaching—were shams used by Odebrecht to send

approximately U.S. $1 million[7] to Villarán's re-election campaign.  Ex. 30 at 5; Ex. 31 at 2–3; Ex.

32 at 2–3.  Generación submitted invoices to Rutas for work it had not performed; Rutas paid the

invoices; and Meiggs passed the funds from Generación to Villarán.  Ex. 17 at 2; Ex. 31 at 2–3.

On June 25, 2014, Rutas obtained the MML's approval for the project, and on July 7, 2014,

it closed on the financing.  Ex. 4 at ¶¶ 639–40; Ex. 13 at 30–32.  Sepúlveda (who attended the

August 2013 meeting in Castro's office) received a "success fee" of U.S. $3.51 million upon

closing.  Ex. 33.  Payment of the success fee is consistent with Odebrecht's acknowledgement in

its DOJ plea agreement that it offered "success fees" to co-conspirators as bribes paid upon

financial closings of government contracts.  Ex. 1 at ¶ 26.  The success fee was wired from a

JPMorgan Chase Bank account to a Wells Fargo Bank, N.A. account, which belonged to Latin

America Enterprise Fund Managers, LLC ("Latam Fund"), a Delaware entity transacting business

---

[7] Order of Indictment at 207, *2013 Recall and 2014 Re-election of Former Mayor Susana María del Carmen Villarán de la Puente - Odebrecht - OAS*, Exp. 36-2017-108-5001-JR-PE-03, National Superior Court of Specialized Criminal Justice, Seventh Court of National Preparatory Investigation (2024), https://img.lpderecho.pe/wp-content/uploads/2024/11/Exp.-36-2017-108-LPDerecho.pdf.

in Florida. Ex. 33; Ex. 34. Sepúlveda founded this company with former Peruvian President Kuczynski, who was placed on house arrest in 2019 while under investigation for bribery. Ex. 35.

Latam Fund transferred the success fee to different persons and entities: U.S. $1,942,485 to First Capital Inversiones Asesoría Limitada ("First Capital"), a company owned by Sepúlveda, Declaration of Richard Allemant ("Peruvian Counsel Decl.") at ¶ 25; U.S. $722,865.00 to Westfield Capital Limited, Inc. ("Westfield Capital"), a company owned by Kuczynski, *id.*; Ex. 34; and the remaining funds to Andrés Juan Milla Comitre ("Comitre") and Denise Barbara Hernández ("Barbara"), comptroller of Latam Fund. Peruvian Counsel Decl. at ¶ 25. The Westfield Capital bank account that received the funds was in Wells Fargo. *Id.* at ¶ 24; Ex. 33. As discussed in more detail below, the MML seeks discovery for use in the Contemplated Criminal Proceeding concerning this "success fee."

### C.  Odebrecht Hedges Its Bets, Bribing Villarán's Opponent Luis Castañeda

Given Villarán's waning popularity heading into the re-election, Rutas was—as Barata put it—"afraid that a possible new mayor might come to harm the Company's interests," i.e., the Concession Contract. Ex. 16 at 1. Therefore, Rutas hedged its bets by making illegal contributions to the campaign of Villarán's opponent, Luis Castañeda Lossio ("Castañeda"). Ex. 37 at 4–5. According to Martín Bustamante Castro ("Bustamante"), Castañeda's campaign manager, Odebrecht promised Bustamante about U.S. $500,000 for Castañeda's campaign, and "Odebrecht's interest was to maintain the legal stability of the Rutas de Lima contract." *Id.* Odebrecht delivered the funds to Bustamante in cash. *Id.* at 4.

After Castañeda defeated Villarán in the October 2014 election, he preserved the Concession Contract by entering two agreements with Rutas, in December 2015 and June 2016, to "carry out" the Bankability Addendum (the "2015 and 2016 Acts"). Ex. 4 at ¶ 686. Together,

the 2015 and 2016 Acts permitted Rutas to increase the tolls four times over the next two years—to 175% of the toll prices originally stipulated in the Concession Contract, without making the requisite investments. Ex. 2 at ¶¶ 111–112, 156. To date, there is no economically logical explanation for this development. Various MML officials were involved in the corruption during the Castañeda administration, including Jaime Villafuerte Quiroz (Manager of GPIP), Elizabeth Vilca Quispe (Deputy Manager of GPIP), Guillermo Segundo Gonzales Criollo (Contract Supervision Manager), and Raúl Javier Bueno Cano (Contract Coordinator). Peruvian Counsel Decl. at ¶ 27.

### D. Brookfield Infrastructure Acquires Rutas from Odebrecht

Before purchasing a majority stake in Rutas from Odebrecht, Brookfield representatives met with Castañeda (who was regularly receiving bribes from Odebrecht) to discuss Brookfield's interest in the purchase. Ex. 38 at ¶ 48. In describing the meeting, Benjamin Vaughan, Brookfield Infrastructure's Managing Partner and Chief Operating Officer ("Brookfield's COO"),[8] stated that the MML representatives "were interested in seeing the process [of the sale] completed promptly," hoping for a new investor to "provide financing backup to the Concession, which Odebrecht could not provide due to its financial problems." *Id.*

As part of the acquisition, Brookfield Infrastructure performed "due diligence" from March 2016 to June 2016 to evaluate the risks associated with Rutas, including any anti-bribery and corruption ("ABC") issues. *Id.* at ¶¶ 14, 30–31. Brookfield's COO stated that "satisfactory ABC due diligence" was necessary to move forward with the deal. *Id.* at ¶¶ 34–35. Brookfield's COO "participated" in committees that "approved" the sale. *Id.*

---

[8] Rutas submitted this Declaration in the arbitration proceedings between Rutas and MML. It was later filed in the D.D.C. case mentioned above.

Brookfield Infrastructure's due diligence team included U.S. law firm Cahill Gordon & Reindell LLP ("Cahill") and KPMG for "tax, labor, accounting, model review and ABC." *Id.* at ¶¶ 31, 39. Cahill oversaw KPMG's due diligence projects. *Id.* at ¶¶ 40–42. Other international corporations were also involved in the sales process: Scotiabank ran the "competitive process" of the sale; and Citibank, Arup Latin America S.A. ("Arup"), and Scotiabank "monitored" funds from toll revenues or operations that were placed in an escrow account. *Id.* at ¶¶ 25, 32, 42. These entities would have obtained information relevant to the Criminal Proceedings and Contemplated Criminal Proceeding, as described in more detail below.

Reports of inappropriate links between Odebrecht and the Villarán administration go to 2011.[9] By the time Brookfield Infrastructure began its due diligence, Odebrecht's corrupt business in Peru and elsewhere was publicly known, with substantial coverage over the twelve months leading up to the sale. *See* Exs. 39–42.

The same month that Brookfield Infrastructure began its due diligence (March 2016), Ex. 38 at ¶ 31, Marcelo Odebrecht, Odebrecht's then-CEO, was sentenced to 19 years in prison for paying millions of dollars in bribes. Ex. 43. The same month, a Peruvian public prosecutor opened investigations (Case File No. 76-2016) into the suspected favoring of Odebrecht by former Peruvian president Alejandro Toledo ("Toledo")[10] and Kuczynski. Ex. 44; Ex. 45.[11] A month

---

[9] *See* Ex. 39; Ex. 42; Ex.78. Suspicions over Odebrecht's corruption in Peru were similarly reported years before the Operation Car Wash investigation began in 2014. For example, in 2011, Peruvian newspaper *La República* questioned Odebrecht's donations to build a statute ordered by then-President of Peru Alan Garcia, given that Odebrecht had won government contracts worth over U.S. $61.7 million (PEN 170 million) during his presidency. Ex. 79; Ex. 41. Peruvian newspaper *IDL Reporteros* also highlighted concerns about Odebrecht's potential misconduct via project budget overruns, such as the U.S. $100 million overrun on the Metro de Lima Linea 1 project investigated by Peruvian authorities. Ex. 3.

[10] Toledo was recently sentenced to 20 years in prison. *Peru Ex-President Toledo Sentenced to Two Decades in Prison for Accepting Bribes*, REUTERS (Oct. 21, 2024), https://www.reuters.com/world/americas/peru-ex-president-toledo-sentenced-two-decades-prison-accepting-bribes-2024-10-21/.

[11] According to the opening of the prosecutorial investigation (No. 76-2016), the case directly concerns the approval of Law 28670, made at the end of January 2006. The crimes under investigation were improper use of public office

later, Peru's special parliamentary commission for Operation Car Wash (*La Comisión Lava Jato*) issued a preliminary report specifically identifying "Rutas de Lima SAC" and "Proyecto Vías Nuevas de Lima" (Rutas's other name) as a project under investigation for corruption. Ex. 46 at 1–3.[12]  Rutas was among 14 Odebrecht projects under investigation. *Id.* at 30.

Brookfield's COO has admitted that Brookfield Infrastructure was "aware of a congressional investigation with respect to several Brazilian construction companies" at the time of the due diligence process, but claimed inexplicably that "Rutas de Lima was not one of them," even though it was one of only 14 projects listed. Ex. 38 at ¶ 29.

Brookfield's COO also admitted that Brookfield was "aware of the Lava Jato criminal proceedings against Odebrecht in Brazil," but disclaimed knowledge of any "judicial investigation against Odebrecht in Peru." *Id.*  He failed to mention that Odebrecht was a primary suspect in the April 2016 "congressional investigation" in Peru involving "several Brazilian companies" suspected of bribing Peruvian officials as well as widespread media and public reporting stating exactly the opposite. Ex. 46.

Brookfield Infrastructure's due diligence team dug its head in the sand. The investigation found "risks for bribery and corruption" and that parts of Rutas's "compliance program" were "less than satisfactory," including due to a "lack of [an] internal audit function."  Ex. 38 at ¶ 42. Brookfield Infrastructure, however, found the results "satisfactory" and moved forward with the acquisition. *Id.* at ¶¶ 34, 50. According to Brookfield's COO, the due diligence team reviewed

---

and collusion.  According to this article, Toledo and Kuczynski favored Odebrecht.  According to various reports from the Comptroller's Office, Odebrecht faced several lawsuits for breach of contract, but thanks to the aforementioned law, it managed to participate in the tender for one of the sections of the Southern Interoceanic Highway and also for the Olmos Project.

[12] The Lava Jato Commission Report appears to have been publicly available during Brookfield's due diligence period. Ex. 9.  *Informe Preliminar*, Comisión Investigadora Encargada de Investigar el Pago de Presuntas Coimas a Funcionarios Peruanos por Parte de Empresas Brasileñas (Congreso de la República, Apr. 2016), https://www2.congreso.gob.pe/Sicr/TraDocEstProc/Expvirt_2011.nsf/mociones20162021/00829?OpenDocument.

Rutas's internal documents and communications with government entities, performed forensic testing on Rutas's transactions, conducted interviews, and conducted background checks, including "searches of publicly available information, including media sources, public records, and government databases," and monitored funds in an escrow account. *Id.* at ¶ 42. Aside from generalized descriptions, Brookfield Infrastructure has not disclosed what documents it reviewed, what witnesses it interviewed, or what information about corruption it discovered or assessed as part of the due diligence process. The company claims, however, it performed a "detailed and highly customized" ABC due diligence process. *Id.* at ¶ 38.

Upon acquiring its 57% stake on June 28, 2016, Brookfield Infrastructure chose to remain in a consortium with Odebrecht. *Id.* at ¶¶ 11, 50. Following the sale, multiple Odebrecht executives held (and may continue to hold) positions at Rutas post-acquisition including Odebrecht's former lead for Peru (Barata), Felipe Ferreira Neves ("Neves"), Raúl Neto, Bruno Falcao De Seixas Sampaio ("Sampaio"), Luiz Martins Catharino Gordilho Neto ("Gordilho"), and Oscar Eduardo Salazar Chiappe ("Chiappe"). Peruvian Counsel Decl. at ¶ 19. These practices are inconsistent with market practices to remedy corruption when acquiring tainted assets and raise questions about whether Brookfield Infrastructure's purchase was a legitimate transaction or a mechanism to protect Odebrecht's assets from potential seizure in criminal proceedings in Peru.

### III.    Brookfield Regularly Acquires Companies Accused of Fraud and Corruption

Brookfield has consistently acquired assets linked to fraud and corruption, raising concerns about its due diligence processes, risk appetite, and exposure to corruption-related liabilities.[13]

On April 25, 2017, Brookfield Business Partners LP acquired a 70% stake in Odebrecht

---

[13] *See also* Ex. 50; Jeff Gray, *How Brookfield Snatched Bargain Assets Amid Brazil Panic*, THE GLOBE AND MAIL, (Sept. 23, 2023), https://www.theglobeandmail.com/business/article-how-brookfield-snatched-bargain-assets-amid-brazil-panic/.

Ambiental S.A. ("Odebrecht Ambiental"), a Brazilian wastewater management company, for U.S. $908 million. Ex. 48. Like Rutas, this acquisition occurred in the wake of the Operation Car Wash corruption investigation. Ex. 50 at 3.

Brookfield's attempted purchase of Odebrecht's Olmos irrigation business in Peru, initially agreed upon on November 26, 2016, further demonstrates the pattern. Ex. 52. The proposed U.S. $580 million acquisition of H2Olmos and Concesionaria Trasvase Olmos, including irrigation tunnel maintenance and operation rights, was temporarily halted by a Peruvian special prosecutor for Odebrecht cases over concerns it would allow Odebrecht to pay creditors outside Peru, bypassing potential seizure of funds under anti-graft laws. *Id.*; Ex. 53. Brookfield Infrastructure and its partner entity ultimately cancelled the transaction on March 12, 2018. Ex. 54. In 2016, Brookfield acquired a 57.6% stake in Colombian state power company Isagen for nearly U.S. $2 billion. Ex. 55. A month after the acquisition, Colombia's Attorney General's office launched a corruption investigation into the Minister of Finance Mauricio Cardenas. *Id.* The investigation, prompted by a complaint from a government oversight NGO, alleged that Cardenas and the Colombian government had illegally sold the company, and that Cardenas had shirked his duties as a public servant. *Id.*

In 2017, Brookfield acquired a 90% stake in Nova Transportadora do Sudeste from Brazilian state-owned energy company Petroleo Brasileiro S.A. ("Petrobras"). Ex. 5; Ex. 3. The sale was temporarily halted due to alleged discrepancies and lack of transparency in the sale process. Ex. 3. In 2023, the National Federation of Oil Workers demanded an investigation into the contracts and assets sold by Petrobras, raising concerns about the transaction's propriety.[14]

---

[14] Separate from the sale transaction, in 2018 Petrobras entered into an agreement with U.S. and Brazilian authorities to pay more than U.S. $850 million to resolve government investigations against it, including under the U.S. Foreign Corrupt Practices Act. *See* Press Release, *Petróleo Brasileiro S.A. – Petrobras Agrees to Pay More Than US $850*

Ex. 7.

Finally, in 2019, Brookfield Infrastructure acquired the East-West Pipeline from Reliance Industries Limited in India.  Ex. 8 at 19; Ex. 10.  This acquisition occurred just as allegations of fraud and money laundering related to the pipeline's construction emerged.  Dutch authorities had opened an investigation into alleged inflated invoicing schemes used during the pipeline's construction.  Ex. 10.

In short, Brookfield has repeatedly acquired companies, like Rutas, that have been plagued by allegations of fraud, corruption, and other misconduct, and its due diligences appear to have regularly come back as satisfactory.

## IV.    Four Actual and Contemplated Criminal Proceedings Target Odebrecht and Brookfield Corruption and Misconduct in Peru

The MML seeks discovery for use in the Criminal Proceedings, which consist of one contemplated proceeding (a "preliminary investigation") and several ongoing criminal proceedings in Peru.  Criminal investigations in Peru are separated into stages that culminate in a trial, and the judiciary is involved from an early stage in the process.  Peruvian Counsel Decl.  at ¶ 8.  For the case to advance to each new stage, it must satisfy increasing burdens of proof.

To begin, only the *fiscal* (or state prosecutor), who leads the investigation and prosecution of criminal offenses, has the power to initiate a preliminary investigation after determining the evidence satisfies the "simple suspicion" standard.  *Id.* at ¶ 9.  The fiscal will then open a *carpeta fiscal* (case file) through a *provision fiscal* (prosecutorial order), and the investigated person will be "formally notified of the investigation, the provisional charges, the facts of the case, and their right to legal counsel."  *Id.* at ¶ 10.  The fiscal can ask the judge to impose preventative measures,

---

*Million for FCPA Violations*, U.S. DEP'T OF JUSTICE (Sept. 27, 2018), https://www.justice.gov/opa/pr/petr-leo-brasileiro-sa-petrobras-agrees-pay-more-850-million-fcpa-violations.

such as travel restrictions or detention, on the investigated person.  *Id*.  During the preliminary investigation phase, the fiscal gathers evidence to support the case.  *Id*.

To move to the next "preparatory investigation" stage, the fiscal must determine that there is "revealing suspicion" that a crime has occurred.  *Id*. at ¶ 12.  At that point, the case is assigned to a tribunal and judge.  *Id*.  The judge supervises the investigation as a neutral adjudicator, deciding disputes between the fiscal and the defense regarding procedural measures, and monitoring compliance with deadlines.  *Id*.  This phase involves "more comprehensive evidence gathering," such as obtaining expert opinions and seeking search warrants.  *Id*.

To move to the next "accusation" phase, the fiscal must present a formal accusation to the judge.  *Id*. at ¶ 14.  The judge then holds a hearing and reviews the fiscal's formal charges to determine whether the presented facts meet the standard of "beyond a reasonable doubt" that a crime was committed.  *Id*.  If the judge makes that finding, the case progresses to an oral trial with the same "beyond a reasonable doubt" burden of proof.  *Id*. at ¶ 16.

The MML seeks discovery for use in four Peruvian criminal cases involving the Concession Contract.  The first is Case No. 029-2023 (previously No. 36-2023), currently in the preliminary investigation phase (the "Contemplated Criminal Proceeding" or the "Brookfield Money Laundering Investigation").  *Id*. at ¶ 18.  On August 8, 2023, the fiscal from the Peru "Special Car Wash Team" initiated the preliminary investigation for money laundering charges for those responsible for Brookfield Peru.  *Id*.  Among other issues, the Brookfield Money Laundering Investigation is reviewing the circumstances of Brookfield Infrastructure's acquisition of Odebrecht's majority stake in Rutas.  *Id*.  This includes examining whether Brookfield has violated its own ethical codes or anti-corruption policies.  It is also reviewing whether Odebrecht has continued to exercise control over Rutas following the acquisition.  *Id*. at ¶ 20.  For example,

15

records from Peru's National Superintendence of Public Registries show that Odebrecht executives Barata, Neves, and Pereira were granted powers of attorney in Rutas until at least January 2017. *Id.* at ¶ 19.  Between 2016 and 2023, Odebrecht executives Sampaio, Gordilho, and Chiappe were appointed as directors and legal representatives in Rutas.  *Id*.  Additionally, Odebrecht appears to have continued to manage the "e-pass" automatic toll collection service for Rutas.  *Id*.  The Brookfield Money Laundering Investigation is examining whether these and other acts violated Peruvian law.  *Id.* at ¶ 20.  The Brookfield Money Laundering Investigation suggests that Brookfield's purchase of Odebrecht assets may have been a money laundering scheme, designed to conceal assets from corruption investigations, and to protect Odebrecht's assets from seizure through the Brookfield acquisition.

The other three cases are Case Nos. 30-2017, 31-2017, and 448-2017 concerning corruption, money laundering, and related charges.  In Case No. 30-2017 (the "Villarán Bribery Case"), Villarán, other MML officials, and an Odebrecht executive, José Adelmaro Pinheiro Filho, are charged with bribery related crimes and money laundering.[15]  This includes allegations that Villarán solicited approximately U.S. $3 million in improper payments from Odebrecht in connection with the Concession Contract.  A Peruvian judge has recently found at the accusation stage that the case meets the necessary factual and legal requirements to proceed to trial.  *Id.* at ¶ 22.  The case is now in the trial stage in the Third National Court of Preparatory Investigation of Crimes of Corruption of Officials.  *Id*.

Next, Case No. 31-2017 is in the accusation stage in the Seventh Court of National Preparatory Investigation of the National Superior Court of Specialized Criminal Justice (the

---

[15] The accused also include Castro, Maria Julia Mendez Vega, Daniela Maguiña Ugarte, and José Adelmahiro Pinheiro Filho.  *See* Peruvian Counsel Decl. at ¶ 22.

"Rutas Money Laundering Case"). *Id.* at ¶ 24. Among other conduct, this case includes allegations of money laundering for Odebrecht's payment, as described above, to Rutas's purported financial advisor, Sepúlveda, of an illegal "success fee" of U.S. $3.5 million upon the financial closing of the Concession Contract. *Id.* Odebrecht allegedly made this payment to the U.S. bank account of the company that Sepúlveda controlled with former President Kuczynski. *Id.* at ¶ 25. In addition to Sepúlveda and Kuczynski, the Peruvian prosecutors are investigating Gloria Jesus Kisic Wagner and Jose Luis Bernaola Nufflo. *Id.*

Finally, Case No. 448-2017 (the "Concession Contract Corruption Case") is in the preparatory investigation stage in the Eighth Court of National Preparatory Investigation of the National Superior Court of Specialized Criminal Justice. *Id.* at ¶ 27. This case centers on additional alleged corruption in connection with the Concession Contract that benefited Rutas at the expense of Lima. *Id.* The individuals accused are Villarán, as well as several former MML officials. *Id.* The allegations, among others, are that the former MML officials overvalued construction works, and agreed to unjustified modifications to mandatory projects, improper toll rate increases, and the implementation of improper compensation mechanisms relating to the Concession Contract. *Id.*

## V.     The MML Seeks Discovery for Use in Peruvian Criminal Proceedings

The MML seeks discovery from individuals and entities (the "Discovery Subjects") that likely possess documents and other information relevant to the Criminal Proceedings and Contemplated Criminal Proceeding.[16]

---

[16] The MML has not set a return date or deposition date in the subpoenas, given that the Court's timeline for ruling on these discovery requests is uncertain. Should the Court grant the MML's application, the MML will set reasonable dates in the subpoenas.

**A. Discovery Relating to Brookfield Infrastructure's Acquisition and Operation of Rutas**

First, the MML seeks documents from entities involved in Brookfield Infrastructure's acquisition of a majority stake in Rutas and the operation of the Concession Contract.[17] This includes the relevant Brookfield entities, Cahill, KPMG LLP ("KPMG"), Scotiabank, Citibank, N.A. ("Citibank"), and Arup. This information is relevant to the Contemplated Criminal Proceeding and Criminal Proceedings, especially the Brookfield Money Laundering Investigation, the Villarán Bribery Case, and the Concession Contract Corruption Case.

**i. The Brookfield Entities, Cahill, and KPMG Involved in the Cursory Due Diligence**

Brookfield, Cahill, and KPMG performed inadequate due diligence before purchasing Odebrecht's interest in the Concession Contract. According to the Brookfield COO Declaration, Brookfield Infrastructure hired Cahill and KPMG to assist with the due diligence.

The due diligence records the MML requests consist of non-privileged and factual information,[18] including materials received in response to document and information requests

---

[17] The Brookfield Infrastructure COO Declaration discussed various entities involved in the sale in shorthand. *See* Ex. 38 at ¶¶ 2, 25, 31, 39, 42 (referring to "Brookfield Infrastructure Group," "Scotiabank," "KPMG," and "Citibank"). Among others, the MML is seeking discovery from entities that, upon investigation, appear to be the companies referenced in the declaration.

[18] Courts routinely grant discovery requests for factual information. *See In re Lane*, No. 22-MC-34 (LGS), 2022 WL 16737132, at *4 (S.D.N.Y. Nov. 7, 2022) (granting § 1782 petition seeking discovery from law firm where "subpoena in several places expressly limit[ed] the scope of requested documents to 'non-privileged [c]ommunications'") (cleaned up). "Since the attorney-client privilege protects communication between the client and the attorney, and not the underlying facts, see *Upjohn Co., et al. v. United States, et al.*, 449 U.S. 383, 395–96 (1981) (quoting *Philadelphia v. Westinghouse Electric Corp.*, 205 F.Supp. 830, 831 (E.D.Pa.1962)), this factual information must be disclosed." *Women's InterArt Ctr., Inc. v. N.Y.C. Econ. Dev.*, 223 F.R.D. 156, 160 (S.D.N.Y. 2004). Plus, claims of privilege should not serve as a basis to deny a 1782 application outright. *See In re SBK Art LLC*, No. 24-MC-0147 (PAE) (RFT), 2024 WL 4264893, at *58 (S.D.N.Y. July 30, 2024) ("To the extent production in this matter raises privilege issues, it is likely that they can be addressed through narrowing the scope of the proposed subpoena and relaxing the requirements for a privilege log – which are preferable to simply recommending that the Application be denied."). Rather, any privilege objections should be raised after the application is granted on a document-by-document basis. *See Pearson v. Trinklein*, No. 21-MC-770 (ALC) (JLC), 2022 WL 1315611, at *4 n.6 (S.D.N.Y. May 3, 2022) (opting not to address matter of privilege where "issue would be more appropriately adjudicated with respect to particular documents that raise a [specific] question"). MML does not have any interest in obtaining privileged documents, and has narrowly tailored its draft subpoenas to avoid seeking privileged material.

submitted to Rutas and Odebrecht, Rutas's financial statements, Rutas's contracts with third parties, Rutas's communications with government entities and other third parties, documents related to the forensic testing of Rutas's transactions, Rutas's interview questionnaire responses, publicly available information obtained as part of due diligence, and other related documents. Peruvian Counsel Decl. at ¶ 36.

Additionally, the MML seeks a 30(b)(6) deposition of the Brookfield entities and a deposition of Brookfield's COO. Brookfield's COO has first-hand knowledge of Brookfield Infrastructure's due diligence and participated in the company's decision to proceed with the transaction despite widespread public knowledge of Odebrecht's involvement in corruption in South America—including Peru. *See infra* at (I)(A)(ii). The information requested is relevant to all the proceedings, especially the Brookfield Money Laundering Investigation, where those responsible for Brookfield Peru, their knowledge of corruption with respect to the Concession Contract, and Brookfield's ongoing relationship with individuals associated with Odebrecht are key issues. Peruvian Counsel Decl. at ¶¶ 36–41, 44. The due diligence documents focus on identifying corruption risks and can be used to establish the elements of aggravated collusion, criminal association to commit a crime, incompatible negotiation, money laundering, and active and passive bribery. *Id.* at ¶ 37. The documents may reveal agreements or improper arrangements with public officials aimed at defrauding the MML, show a structured network of entities and individuals collaborating to achieve illegal objectives, illustrate transactions, transfers, or schemes designed to disguise the unlawful origins of assets, and reveal transactions or communications indicating that benefits were offered or received to influence MML public officials. *Id.* at ¶¶ 40–41. The information sought is also relevant to the other proceedings, as the discovery concerns the corruption underlying the Concession Contract.

Regarding the Brookfield entities at issue, the MML requests documents from Brookfield Infrastructure (Brookfield Infrastructure Partners L.P.), as well as Brookfield Corporation (formerly called Brookfield Asset Management Inc., "Old BAM") and Brookfield Asset Management Ltd. ("New BAM").[19]    Brookfield Infrastructure is the entity that acquired Odebrecht's interest in Rutas.  Brookfield Corporation, or Old BAM, is the parent company of Brookfield Infrastructure and New BAM.  According to Brookfield's COO, the "due diligence and acquisition of Rutas de Lima" followed the "corporate processes" of Old BAM (now Brookfield Corporation).[20]  Ex. 38 at ¶ 17.  "[Old] BAM and the portfolio companies that [Old] BAM controls have a code of conduct, an ABC Policy, and a Whistleblowing Program, and are subject to regular and ongoing internal audits."  *Id.*  For example, "[Old] BAM requires portfolio companies to install an ethics hotline for anonymous reporting that is accessible to employees, contractors, and

---

[19] Old BAM was originally a single entity that combined both asset management activities and proprietary investments under one corporate umbrella, including the management of Brookfield Infrastructure.  *See* Notice of Special Meeting of Shareholders and Management Information Circular with Respect to a Plan of Arrangement Involving Brookfield Asset Management Inc., Brookfield Asset Management Ltd. and Others and Resulting in the Separation of Brookfield Asset Management Inc. into Brookfield Asset Management Ltd. and Brookfield Corporation at 14, 23, Brookfield Asset Management Inc. (Nov. 9, 2022), https://bn.brookfield.com/sites/brookfield-ir/files/2022-10/brookfield-final-circular-sedar-filing-version.pdf [*hereinafter* Brookfield Notice].  On December 9, 2022, Old BAM was divided into two publicly traded entities—the "corporation" (Old BAM was renamed to Brookfield Corporation) and the "manager" (New BAM).    Press Releases 2022, Brookfield Corporation (Sept. 23, 2022), https://bn.brookfield.com/press-releases/brookfield-board-directors-unanimously-approves-distribution-25-interest-its-asset.  The "corporation" focused on investments, while the "manager" focused on asset management.  *See* Brookfield Notice at 14, 23.  Old BAM's asset management business was "separated into a standalone business," *id.* at 52, "now held 100% by Brookfield Asset Management ULC," which "is owned 75% by Brookfield Corporation and 25% by Brookfield Asset Management [Ltd.]," New BAM.  Brookfield Infrastructure Partners L.P. 2022 Annual Report, https://bip.brookfield.com/sites/bip-brookfield-ir/files/2023-03/bip-2022-20-f-vf.pdf.    New BAM is the "manager" of Brookfield Infrastructure.  Brookfield Corporation acts as the parent corporation of the Brookfield entities; it also owns a stake in New BAM and Brookfield Infrastructure.  *Internal Control of Financial Reporting*, Brookfield Corporation at 177 (Mar. 18, 2024), https://bn.brookfield.com/sites/brookfield-bn/files/BN-IR-Master/Annual-Reports/2023/Consolidated%20Financial%20Statements%20and%20Notes.pdf.

[20] The references to "Brookfield Asset Management" in the Declaration of Benjamin Vaughan appear to refer to Old BAM (now Brookfield Corporation).  The declaration is dated June 2021, Ex. 38 at 11, when Old BAM served as the manager of Brookfield Infrastructure.  *See also* Brookfield Infrastructure 2021 Annual Report at 1, 104 (referring to "Brookfield Asset Management," which is defined as "Brookfield Asset Management Inc.," as Brookfield Infrastructure's "manager").  New BAM was created the following year, in 2022.  *See* Notes to the Condensed Consolidated Financial Statements, Brookfield Asset Management Ltd., https://otp.tools.investis.com/clients/us/brook_bam/SEC/sec-show.aspx?Type=page&FilingId=16858746-198636-235064&CIK=0001937926&Index=27000 ("The Manager [New BAM] was incorporated on July 4, 2022").

temporary workers within six months of the acquisition." *Id.*  Brookfield Corporation also sets the Sustainability Due Diligence Protocol applicable to Brookfield Infrastructure, which involves assessments of "bribery and corruption."  Ex. 60 at 6, 18 (defining "Brookfield" as "Brookfield Corporation" and discussing "Brookfield-wide" Sustainability Due Diligence Protocol). Additionally, the "Corporation's Board of Directors reviews and approves the Code [of Business Conduct and Ethics]"—which Brookfield Infrastructure follows—"on at least an annual basis and is ultimately responsible for monitoring compliance with the Code."  Ex. 61 at 5, 20.  This Code prohibits bribery or any activity that facilitates any criminal activities and incorporates the company's "Anti-Bribery and Corruption Policy." *Id.* at 5, 16–17.

Regarding New BAM, this entity is now the manager of Brookfield Infrastructure and thus will possess information concerning Brookfield Infrastructure and its due diligence process. *Id.* at 6.  Various committees and working groups that monitor and oversee Brookfield Infrastructure's business operate at the [New] Brookfield Asset Management level. *See id.* at 14.  This sustainability business includes "[o]perat[ing] to the highest ethical standards by conducting business activities in accordance with our Code of Business Conduct and Ethics." *Id.* at 14.

### ii.    Scotiabank, Citibank, and Arup Participate in the Brookfield Acquisition

The MML seeks targeted discovery from Scotiabank, Citibank, and Arup.  According to the Brookfield COO Declaration, Rutas was required to maintain its funds in monitored escrow accounts.  Ex. 38 at ¶ 42.  Operating funds were held in a separate escrow account monitored by Citibank and Arup. *Id.*  Toll revenues were held in an escrow account monitored by Scotiabank. *Id.*  The MML also seeks records from Scotiabank relating to its role as the manager of the Rutas sales process. *Id.* at ¶ 25.

This information is relevant to the Criminal Proceedings and Contemplated Criminal

Proceeding, particularly the Concession Contract Corruption Case. Documents concerning the monitoring of Rutas's escrow accounts and company operations are relevant to prove the elements of aggravated collusion, criminal association, money laundering, and bribery under Peruvian law, as they may show financial flows and agreements that help show the misuse of public office for personal or third-party gain. Peruvian Counsel Decl. at ¶ 40. Escrow account records may show funds or payments tied to decisions or contracts overseen by public officials, including any preferential resource allocation influenced by an official. *Id.* at ¶ 39. They may also show collusive agreements, such as through payments between MML officials and private parties, and reveal financial transactions executed to commit crimes. *Id.* In the Concession Contract Corruption case, for example, financial information from the Rutas escrow accounts is relevant to show that former MML officials engaged in misconduct involving the implementation and operation of the Concession Contract. This includes the financial benefit Rutas received as a result of former MML officials overvaluing construction works, and agreeing to unwarranted modifications to mandatory projects, improper toll rate increases, and unjustified compensation mechanisms.

### B. Discovery Aimed at Exposing Corruption of Former MML Officials and the Concession Contract

The MML seeks documents and other information evidencing financial transactions relating to the corruption of former MML officials and the Concession Contract. The discovery sought includes wire transfer records, account opening documents, internal bank communications, correspondence with account holders, transaction logs, and beneficial ownership information. Documents concerning financial transactions are highly relevant to the Criminal Proceedings and Contemplated Criminal Proceeding, as they can be used to establish the elements of aggravated collusion, criminal association, money laundering, bribery, and incompatible negotiation under

Peruvian law. Peruvian Counsel Decl. at ¶ 40. These records can reveal illicit payments or transfers between parties involved in collusive agreements, expose irregular transactions, establish patterns of coordinated efforts among individuals or entities, show efforts to layer and conceal funds, identify funds transferred to public officials, and expose conflicts of interest for public officials. *Id.*

The discovery subjects include the Clearing House Payments Company L.L.C. ("CHIPS"), the Federal Reserve Bank of New York ("Fed-NY"), Wells Fargo, and JPMorgan Chase & Co. *First*, CHIPS and Fed-NY are wire-transfer clearing houses that commonly act as clearing house banks for U.S. dollar-denominated wire transfers between domestic and international banks. Fed-NY "processes and settles payment orders individually in real time throughout the operating day. Participants can send up to one penny less than U.S. $10 billion in a single transaction. . . . [It] frequently handles what are considered 'retail' payments (i.e., funds transfers that are not interbank transfers). The latter includes funds transfers sent by or to consumers."[21] CHIPS provides both transmission of instruction messages and settlement of funds between institutions to process international U.S. dollar funds transfers made among international banks. CHIPS "is the only private-sector ACH and wire operator in the United States, clearing and settling nearly U.S. $2 trillion in U.S. dollar payments each day, representing half of all commercial ACH and wire volume."[22] Final settlements of transfers made through CHIPS "occur through adjustments in special account balances at the Federal Reserve Bank of New York."[23] CHIPS estimates that it

---

[21] *Fedwire Funds Service Disclosure*, THE FEDERAL RESERVE at 5–6 (Dec. 23, 2019), https://www.frbservices.org/assets/financial-services/wires/funds-service-disclosure.pdf; *Fedwire® and National Settlement Services*, FEDERAL RESERVE BANK OF NEW YORK, https://www.newyorkfed.org/aboutthefed/fedpoint/fed43.

[22] *Our History*, THE CLEARING HOUSE, https://www.theclearinghouse.org/about/history.

[23] Sudhindra Bhat, FINANCIAL MANAGEMENT: PRINCIPLES AND PRACTICE 170 (2d ed. 2008).

handles 95 percent of all U.S. dollar payments moving between countries.[24]  Together, CHIPS and Fed-NY constitute the primary network in the United States for both domestic and foreign large transactions denominated in U.S. dollars.[25]

    The discovery requested from CHIPS and Fed-NY focuses on financial transactions involving individuals and entities that are accused parties[26] in the Criminal Proceedings or otherwise believed to be involved[27] in the corruption.  This includes former MML officials

---

[24] *CHIPS*, FEDERAL RESERVE BANK OF NEW YORK, https://www.newyorkfed.org/aboutthefed/fedpoint /fed36.html.

[25] *See* Will Kenton, *Clearing House Interbank Payments System (CHIPS)*, INVESTOPEDIA (Apr. 17, 2018), https://www.investopedia.com/terms/clearing-house-interbank-payments-system-chips.asp; *Payment Systems in the United States*, BANK FOR INTERNATIONAL SETTLEMENTS 443 (Apr. 1, 2003), https://www.bis.org/cpmi/publ/d53.pdf ("There are two major large-value payment transfer systems in the United States: (1) Fedwire, operated by the Federal Reserve, and (2) CHIPS, operated by the Clearing House Interbank Payments Company L.L.C. (CHIPCo).  Generally, these payment systems are used by financial institutions and their customers to make large-dollar, time-critical transfers.  In addition, financial institutions may use separate communication systems to send payment instructions to their correspondents for the transfer of correspondent balances or to initiate Fedwire or CHIPS payments.").

[26] In the Brookfield Money Laundering Investigation, the persons responsible for Brookfield Peru are investigated. Peruvian Counsel Decl. at ¶ 18.  In the Villarán Bribery Case, the accused are Villarán, Castro, Arzubialde, Maria Julia Mendez Vega, Daniela Maguiña Ugarte, and Jose Adelmahiro Pinheiro Filho.  *Id.* at ¶ 22.  In the Rutas Money Laundering Case, the investigated individuals are Sepúlveda, Kuczynski, Gloria Jesus Kisic Wagner, and Jose Luis Bernaola Nufflo. *Id.* at ¶ 25.  In the Concession Contract Corruption Case, the accused are Villarán, Arzubialde, Juan Andrés Ramos Arapa, Carlos Fernando Steiert Goicochea, Juan José Neyra Montes, Miguel Alfredo Flores Dueñas, Daniela Canales Hernández, Norma Ana Montoya Blua, Lucio Alva Matteucci, Jaime Villafuerte Quiróz, María Del Pilar Márquez Mares Ramos, Elizabeth Vilca Quispe, María Del Rosario Solís Martínez, Guillermo Segundo Gonzales Criollo, Alfieri Bruno Lucchetti Rodríguez, Liliana Martina Orozco Pinto-Bazurco, Demetrio Rojas García, and Raúl Javier Bueno Cano.  *Id.* at ¶ 27.

[27] The following relevant individuals and entities involved in the corruption scheme in the Factual Background Section of this Memorandum of Law: Brookfield Entities, Concesionaria Rutas de Lima S.A.C., Constructora, Consultora y Servicios Generales Generación S.A., First Capital, Latamerica Fund, Westfield Capital, Comitre, Sampaio, Meiggs, Barbara, Prado, Neves, Castañeda, Gordilho, Chiappe, and Pereira.  Moreover, Emmanuel Piqueras Villarán, Soledad Piqueras Villarán, and Manuel Piqueras Luna—Villarán's son, daughter, and ex-husband, respectively—are believed to have received tainted funds.  Ex. 47; Ex. 51.

In addition, Getnisa Ingeniería Civil SLP, a company for which Manuel Piqueras Luna and Soledad Piqueras Villarán served as authorized representatives (*apoderados*) from February 21, 2013 until July 2, 2018, is believed to have received tainted funds.  Ex. 51.

Further, additional entities and individuals are known to be linked to Odebrecht's Bribery Department: Maria Isabel Carmona Bernasconi, Gonzalo Eduardo Monteverde Bussalleu, Isagon S.A.C., Construmaq S.A.C., Select Engineering Consulting and Service, Klienfeld Service LTD, Inversiones el Santuario S.A.C., and Isagon S.A.C. Specifically, Select Engineering Consulting and Service transferred U.S. $442,105.27 to Construmaq S.A.C., owned by Gonzalo Eduardo Monteverde Bussalleu, through Credicorp Bank accounts in April 2014.  Construmaq S.A.C. then transferred U.S. $550,000 to Isagon SAC and U.S. $700,000 to Inversiones el Santuario S.A.C.; both companies are linked to Monteverde Bussalleu and María Isabel Carmona Bernasconi, who used these transfers to move money through Panamanian, U.S., and Peruvian bank accounts.  These transactions were part of a larger money laundering scheme involving Odebrecht bribes, with Klienfeld Service LTD also receiving U.S. $500,000 as part of the operation.

involved in facilitating the award and amendments to the Concession Contract,[28] the Odebrecht executives implicated in corruption that continue to work for Rutas after Brookfield Infrastructure's acquisition,[29] and Rutas's financial advisor and related individuals and entities that received the "success fee" in connection with the financing of Rutas.[30]  Information on these financial transactions is relevant to all of the criminal proceedings.  Peruvian Counsel Decl. at ¶ 41.

With respect to the discovery requests to Wells Fargo and JPMorgan Chase & Co, these are directed at the U.S accounts through which Odebrecht paid the U.S. $3.5 million "success fee" to Rutas's purported financial advisor upon the successful closing of the Rutas transaction, as well

---

These facts are contained in the Order of Indictment at 381–83, *2013 Recall and 2014 Re-election of Former Mayor Susana María del Carmen Villarán de la Puente – Odebrecht – OAS*, Exp. 36-2017-108-5001-JR-PE-03, National Superior Court of Specialized Criminal Justice, Seventh Court of National Preparatory Investigation  (2024), https://img.lpderecho.pe/wp-content/uploads/2024/11/Exp.-36-2017-108-LPDerecho.pdf.

Odebrecht Peru Peajes S.A.C. is relevant as it operates Rutas's e-pass toll collection service.  Its prior leadership, consisting of Barata, Neves, and Pereira Neto (Peruvian Counsel Decl. at ¶ 19), overlaps with Rutas and Odebrecht Latinvest Peru S.A.C., indicating that Odebrecht continued to exercise control over these entities.

The following individuals and entities have been identified by Peruvian special prosecutors as relevant for the Criminal Proceedings: Villarán, Castro, Arzubialde, María Julia Méndez Vega, Daniela Maguiña Ugarte, José Adelmario Pereira Neto / José Adelmario Pinheiro Filho, Prado, Marco Hugo del Mastro Vecchione, Guillermo Adolfo Loli Ramirez, Cecilia Margarita Levano de Rossi, Jorge Antonio Torres Padilla, Marco Antonio Zevallos Bueno, Luis Gómez Cornejo Rotalde, Oscar Ricardo Vidaurreta Yzaga, Juan Carlos Becerra Jara, José César Castro Joo, Mónica Giannina Pozo Palomino, Meiggs, Freddy Jesús Chirinos Castro, Mario Ruas Nogueira, Felicita Graciela Cárdenas Vásquez, Antonio Eleuberto Martorelli, Guilherme Borges de Queiroz, Momentum, Ogilvy & Mather S.A., Chirinos & Salinas Asociados S.A.C. – CHISAC, Asociación de Amigos de Lima Metropolitana, Constructora, Consultora y Servicios Generales Generación S.A., CMR Construcciones S.A.C., Rentable pe S.A.C., Mindshare Perú S.A.C., J. Walter Thompson Company Sucursal del Perú, Asociación Ciudadanos por Lima, Diálogo Vecinal, and Concesionaria Rutas de Lima S.A.C.  Declaration of Scott Curtis Nielson at ¶ 5.  Pedro Martins Pinheiro, Sarita Ledayola Vilchez Catellanos, and Dorado Asset Management have also been identified as relevant individuals and entities for the Criminal Proceedings.  Peruvian Counsel Decl. at ¶¶ 21, 26.

[28] The MML officials are Elizabeth Vilca Quispe (former Deputy Manager of Management of Contracts with Private Participation), Guillermo Segundo Gonzales Criollo (former Manager of Contract Supervision), Jaime Villafuerte Quiroz (former Manager of the Management of Private Investment Promotion (GPIP)), José Luis Bernaola Ñuflo (former Deputy Manager of Public Works), Castañeda (former Mayor of Lima), and Raúl Javier Bueno Cano (former Contracts Coordinator).

[29] The Odebrecht-linked individuals are Barata, Neves, Pereira, Sampaio, Gordilho, and Chiappe.

[30] Rutas's financial advisors and related individual entities are Sepúlveda, Kuczynski, Comitre, Barbara, Latam Fund, First Capital, and Westfield Capital.

as related individuals and entities in the Rutas Money Laundering Case. Obtaining more information regarding these accounts and their inflows and outflows is especially important to that case, as well as to the Villarán Bribery Case and the Concession Contract Corruption Case.

Information concerning these financial transactions is essential in proving the movement and destination of corrupt funds. *Id.* at ¶ 40. This is particularly true considering that many corrupt payments involving Odebrecht were paid in U.S. dollars and through New York and US-based bank accounts. Ex. 1 (Attachment B) at ¶¶ 4–6, 31, 37–39; Ex. 36; Ex. 33. This discovery can reveal financial transactions between the individuals and entities involved, while showing the receipt of suspicious funds, unexplained wealth, and transfers to offshore accounts—common indicators of corrupt practices such as money laundering or the payment of bribes. Peruvian Counsel Decl. at ¶ 43–44.

## **ARGUMENT**

### I.      **The Application Meets Each of the Statutory Requirements for Discovery**

Section 1782 allows federal district courts to authorize litigants to obtain evidence for use in foreign proceedings and provides that:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C § 1782. Accordingly, an applicant seeking discovery under Section 1782 must show that: (1) the party from whom the discovery is sought resides or is found in the district where the application is made; (2) the discovery is intended "for use" in a foreign proceeding; and (3) the application is made by an "interested person" in the foreign proceeding. *Id.* This Application

26

meets all the statutory requirements.

### A. The Discovery Subjects Reside or Are Found in the Southern District of New York

"[P]hysical presence" within a district is not necessary to satisfy the "resides or is found" requirement of Section 1782. *In re del Valle Ruiz*, 939 F.3d 520, 534 (2d Cir. 2019) (interpreting "found" broadly and rejecting any "physical presence" requirement). Instead, an entity's forum contacts must be sufficient to subject it to the district court's personal jurisdiction." *Id.* ("§ 1782's 'resides or is found' language extends its reach to the limits of personal jurisdiction consistent with due process."). "The constitutional limits of personal jurisdiction allow for a showing of either general or specific jurisdiction over each respondent." *In re Golden Meditech Holdings Ltd.*, No. 24 MISC. 24 (DEH), 2024 WL 1349135, at *2 (S.D.N.Y. Mar. 29, 2024). Courts have general jurisdiction "over corporations that are either incorporated in New York or have their principal place of business here." *In re Litasco SA*, No. 23-MC-354 (AS), 2023 WL 8700957, at *1 (S.D.N.Y. Dec. 15, 2023) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). The activity at issue "need not relate to the forum State or the defendant's activity there; they may concern events and conduct anywhere in the world." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021).

Courts have specific jurisdiction over corporations that have taken "some act by which [they] purposefully avail[ed] [themselves] of the privilege of conducting activities within" New York. *Id.* at 359. In other words, the activity at issue "must arise out of or relate to" the corporation's contacts with the forum. *Id.* at 362 (emphasis added). This Court has general and specific jurisdiction over the Discovery Subjects, and they therefore "reside" or are "found" in this District.

27

### i.      Certain Discovery Subjects Are Subject to General Jurisdiction

This Court has general jurisdiction over CHIPS, Fed-NY, Citibank, New BAM, JPMorgan

Chase & Co, and Cahill because they are headquartered in this District.  Exs. 13–15 (CHIPS

headquartered at 1114 Avenue of The Americas, 17th Floor, New York, New York 10036); Exs.

16, 55 (Fed-NY headquartered at 33 Liberty Street New York, NY 10045); Ex. 62 at 1; Ex. 63 at

1 (Citibank headquartered at 388 Greenwich Street New York, NY 10013); Ex. 64 (New BAM

headquartered at 50 Vesey Street, 15th Floor, New York, New York, 10281-0221); Ex. 64 ("[New]

BAM has now changed its head office to New York."); Ex. 84 (JPMorgan Chase & Co

headquartered at 383 Madison Avenue, New York, New York, 10017); Exs. 65–67 (Cahill

headquartered at 32 Old Slip, New York, New York, United States, 10005).  As a result, they

"reside" or are "found" in this District.  *See In re Kuwait Ports Auth.*, No. 1:20-MC-00046-ALC,

2021 WL 5909999, at *6 & n.8 (S.D.N.Y. Dec. 13, 2021) (concluding that the court has general

jurisdiction over Citibank, N.A. because it is headquartered in New York, New York and therefore

resides or is found in this District); *In re Golden Meditech Holdings Ltd.*, No. 24 MISC. 24 (DEH),

2024 WL 1349135, at *2 (S.D.N.Y. Mar. 29, 2024) (same); *In re Zarzur*, No. 22 MISC. 348 (AT),

2024 WL 81517, at *1 (S.D.N.Y. Jan. 8, 2024) (concluding that CHIPS and Fed-NY "reside in

this District"); *In re Vinmar Overseas, Ltd.*, No. 20-MC-277 (RA), 2020 WL 4676652, at *1

(S.D.N.Y. Aug. 12, 2020) (concluding that CHIPS resides or is found in this District because it is

headquartered in this District).

### ii.      The Remaining Discovery Subjects Are Subject to Specific Jurisdiction

This Court has specific jurisdiction over Brookfield Corporation, Brookfield Infrastructure,

KPMG, Scotiabank, Arup, and Wells Fargo, and as a result, they are "found" in this District.

Specific jurisdiction exists where the discovery sought "arise[s] out of or relate[s] to" the entities'

contacts with this District.  *Ruiz*, 939 F.3d at 530 (discussing standard in the context of Section

1782).  While the Second Circuit espoused the view that the "arising out of or related to" standard "required some causal relationship between an entity's in-forum contacts and the proceeding at issue," *Ruiz*, 939 F.3d at 530, the Supreme Court rejected any strict causation requirement two years later in *Ford*, 592 U.S. at 361–62.  "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction *without a causal showing*."  *Ford*, 592 U.S. at 362 (emphasis added) ("[W]e have never framed the specific jurisdiction inquiry as always requiring proof of causation—i.e., proof that the plaintiff's claim came about because of the defendant's in-state conduct.").  Even if the activities in the forum state did not cause the injuries, specific jurisdiction is appropriate if the contacts are sufficiently related to the claims.  *Id.*   In the context of Section 1782, that means that discovery is appropriate if the discovery has a meaningful connection to this District, even if the discovery sought does not originate directly from this District.

Here, the discovery sought—at a minimum—"relates to" the Discovery Subjects' contacts with this District.

### 1. Brookfield Corporation

The discovery sought from Brookfield Corporation "relates to" Brookfield Corporation's infrastructure business in this District.  The MML seeks discovery concerning Brookfield Corporation's due diligence policies and implementation as it relates to Brookfield Infrastructure's acquisition of a majority stake in Rutas.  Brookfield Corporation has close ties to New York, including an office in New York, New York, and multiple members of the board of directors based in New York.  Ex. 68; Ex. 69.  The company "has been publicly traded on stock markets in North America for over 100 years"—including the New York Stock Exchange—and has "governance practices that are supported by (i) its registration as a regulated investment advisor with multiple

regulatory bodies; including the US Securities and Exchange Commission, (ii) periodic audits by internal and external auditors; and (iii) . . . corporate policies and processes." Ex. 38 at ¶ 12.

Indeed, Brookfield "Corporation's Board of Directors reviews and approves the Code [of Business Conduct and Ethics]"—which Brookfield Infrastructure follows—"on at least an annual basis and is ultimately responsible for monitoring compliance with the Code" (the "Code"). Ex. 61 at 5, 20. This Code incorporates the company's "Anti-Bribery and Corruption Policy" and prohibits bribery or any activity that facilitates any criminal activities. *Id.* at 5, 16–17.

### 2.  Brookfield Infrastructure

Brookfield Infrastructure, through its due diligence processes, purposefully engaged with entities, resources, and personnel in this District, including Brookfield Corporation and Cahill, to evaluate its purchase of a majority stake in Rutas. Ex. 38 at ¶¶ 39, 48. Additionally, Brookfield Corporation's overarching control and New BAM's management over Brookfield Infrastructure (an entity listed on the New York Stock Exchange), establishes a substantial connection to this District. Brookfield Corporation's and New BAM's oversight influences Brookfield Infrastructure's practices and investments to align with U.S. standards and investor expectations, as Brookfield Corporation's U.S.-based policies and resources directly affected Brookfield Infrastructure's risk assessments and due diligence of Rutas. For purposes of specific jurisdiction, these contacts are more than sufficient.

### 3.  Scotiabank

The Bank of Nova Scotia ("Scotiabank") is a global financial institution that operates in the U.S. through Scotia Capital (USA) Inc. and Scotia Holdings (USA) LLC. Exs. 70–71. It regularly transacts business in this District, and provides investment banking products, account services, and payment processing through its New York offices. Ex. 72. According to

Brookfield's COO, "Scotiabank" ran the "competitive process" for the sale of the majority stake

in Rutas in 2016, and also monitored toll revenues held in an escrow account. Ex. 38 at ¶¶ 25, 42.

The discovery sought from Scotiabank "relates to" Scotiabank's financial services business in this

District.

        4.  <u>KPMG</u>

KPMG maintains an office in New York, New York. Ex. 26; Ex. 65. It includes more

than 3,000 professionals who provide audit, tax, and advisory services to some of the country's

largest and most prominent businesses. *Id*. According to Brookfield's COO, "KPMG" "assist[ed]

with tax, labor, accounting, model review and ABC" in the due diligence of Rutas, including

through its affiliates KPMG Peru and KPMG Argentina. Ex. 38 at ¶¶ 39, 42. The discovery sought

from KPMG "relates to" KPMG's tax and advisory business in this District because it provided

those services to assist Brookfield.

        5.  <u>Arup</u>

Arup maintains an office in New York through Arup Americas, Inc. Ex. 59. As a global

consulting firm, Arup provides services for risk assessment, due diligence, and transaction support.

Ex. 73. According to Brookfield's COO, Arup monitored funds for operations held in a separate

escrow account through its affiliate Arup Latin America S.A. Ex. 38 at ¶ 42. The discovery sought

from Arup "relates to" Arup's due diligence, risk assessment, and transaction support business in

this District.

        6.  <u>Wells Fargo</u>

Wells Fargo & Company is a leading financial services company that transacts business in

this District with a major office presence of more than 2,000 employees. Ex. 74. Through its

banking entity Wells Fargo, N.A., it is a participant in the Clearing House Interbank Payments

System, Ex. 75, the Federal Reserve's Fedwire Fund Service, Ex. 76, and has a number of retail bank locations here. The discovery sought from Wells Fargo, which includes retail bank account records and associated documents, "relates to" Wells Fargo's business in this District.

Accordingly, the first statutory requirement is met with respect to the Discovery Subjects.

### B. The Requested Discovery Is Sought for Use in Peruvian Criminal Proceedings

Next, the discovery must be "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). Under the plain language of the statute, this includes "criminal investigations conducted before formal accusation." *Id.* "The term 'for use' is afforded a broad interpretation, and the sought-after evidence need not be admissible or even discoverable under the rules of the foreign jurisdiction." *In re B&C KB Holding GmbH*, No. 22-MC-00180 (LAK) (VF), 2023 WL 1777326, at *3 (S.D.N.Y. Feb. 6, 2023) ("*B&C I*") (cleaned up). Additionally, a foreign proceeding need not be pending or even imminent, so long as it is "within reasonable contemplation." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004). This statutory requirement is met here.

*First*, the MML seeks discovery for use in a foreign "tribunal." The term "tribunal" includes "investigating magistrates, administrative . . . tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts." *Id.* at 258 (quoting Hans Smit, *International Litigation under the United States Code*, 65 COLUM. L. REV. 1015, 1026–27 & nn.71, 73 (1965) ("Smit, *International Litigation*")); *see also ZF Auto. US, Inc. v. Luxshare, Ltd.*, 596 U.S. 619, 627 (2022) (noting that "tribunal" can mean "court," as in the "seat of a judge"). The Criminal Proceedings are before Peru's National Courts of Preparatory Investigation. Peruvian Counsel Decl. at ¶¶ 21–22, 24, 27.

The Criminal Proceedings are also overseen by a judge that "acts as a neutral adjudicator," *Id.* at ¶ 12, and are therefore adjudicatory in nature. *See ZF Auto. US*, 596 U.S. at 627–28 (noting that "tribunal" can also "more broadly" "refer to any adjudicatory body"); *Intel*, 542 U.S. at 259 ("Congress amended § 1782(a) to clarify that the statute covers criminal investigations conducted before formal accusation" (cleaned up)). In the Concession Contract Corruption Case, the judge in the preparatory investigation "supervises the investigation" and "adjudicates any disputes" between the parties. Peruvian Counsel Decl. at ¶ 12. In the Rutas Money Laundering Case, which advanced to the formal accusation phase, the judge holds a hearing called *control de acusación* where he "resolves disputes over the admissibility of evidence" and determines if the case should proceed to trial based on the evidence presented. *Id.* at ¶ 15. And the Villarán Bribery Case is past the formal accusation phase and proceeding to trial; the judge will preside over the trial, evaluate the evidence, and issue a final verdict. *Id.* at ¶ 16.

The Contemplated Criminal Proceeding similarly seeks evidence for use in a "tribunal." The foreign proceeding for which discovery is sought "need not be pending," only 'within reasonable contemplation.'" *Mees v. Buiter*, 793 F.3d 291, 299 (2d Cir. 2015). The Contemplated Criminal Proceeding is in the preliminary investigation stage—meaning that the *fiscal* determined that there was sufficient evidence to open a criminal case, initiated a formal investigation, and brought *criminal charges*. Peruvian Counsel Decl. at ¶ 10. The case is on track to move into the preparatory investigation phase in the Court of National Preparatory Investigation, a foreign tribunal. *Id.* at ¶ 21. These facts therefore establish that a criminal proceeding is within "reasonable contemplation." *See In re Wilhelm*, 470 F. Supp. 2d 409, 411 (S.D.N.Y. 2007) (granting Section 1782 application seeking evidence for a criminal investigation where an "adjudicative proceeding" "lies within reasonable contemplation" (cleaned up)); *In re Application*

*of Shervin Pishevar for an Ord. to take Discovery for use in Foreign Proc. Pursuant to 28 U.S.C. § 1782*, 439 F. Supp. 3d 290, 302–03 (S.D.N.Y. 2020) (finding that criminal proceeding was reasonably contemplated where the "specific legal theor[ies]" for the proceeding were "articulated"); *In re Rodriguez Guillen*, No. 20-MC-102 (ALC), 2020 WL 3497002, at *2 (S.D.N.Y. June 29, 2020) (finding that criminal proceeding was reasonably contemplated where "the criminal complaint formally initiated legal proceedings and an investigation"); *cf. CFE International LLC v. Denham Capital Management LP*, No. 22-MC-91355-FDS, 2023 WL 2988745, at *7 (D. Mass. Mar. 6, 2023) (finding criminal investigation was not in a stage where "judicial proceedings are even under reasonable contemplation" because the prosecutor had not yet brought any criminal charges).

*Second*, the discovery is "for use" in a foreign tribunal. The "for use" requirement focuses "on the *practical ability* of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal." *In re B&C KB Holding GmbH*, No. 23-1014, 2024 WL 3170983, at *2 (2d Cir. June 26, 2024) ("*B&C II*"). Under Peruvian law, the MML may submit evidence to the Criminal Proceedings and Contemplated Criminal Proceeding. Peruvian Counsel Decl. at ¶¶ 28–34, 47–48 (discussing the MML's ability to submit evidence for consideration). This includes the Brookfield Money Laundering Investigation, in which the MML filed the complaint that initiated that investigation. *Id.* at ¶ 18. The tribunal will be able to consider the evidence submitted by the MML in all proceedings. *Id.* at ¶¶ 13, 28–34, 46–47; *B&C I*, 2023 WL 1777326, at *4 ("[I]f charges are brought in Austria, an Austrian court will be able to consider the evidence submitted by B&C."). This also extends to the tribunal in the trial phase of the Criminal Proceeding. "[N]ew evidence may be presented at the *juicio oral* by formally requesting its

admission," and the judge "typically leans towards admission if the evidence is material and was not previously available"—which is the case here.  Peruvian Counsel Decl. at ¶ 16.

### C.  The MML Is an "Interested Person" in the Peruvian Criminal Proceedings

An "interested person" is "intended to include not only litigants before foreign or international tribunals, but also ***foreign and international officials*** as well as any other person whether he be designated by foreign law or international convention ***or merely possess a reasonable interest in obtaining the assistance***")."  *Intel*, 542 U.S. at 256 (citing Smit, *International Litigation*) (emphasis added).  The MML qualifies as an "interested person"—both as a sovereign and as an aggrieved party to those proceedings.  Peruvian Counsel Decl. at ¶¶ 27, 29–32; 28 U.S.C. § 1782.

*First*, the MML is an "interested person" as a sovereign with a vested interest in proceedings that impact its constituents.  *See, e.g.*, *In re Republic of Kazakhstan for an Ord. Directing Discovery from Clyde & Co. LLP Pursuant to 28 U.S.C. sec. 1782*, 110 F. Supp. 3d 512, 516 (S.D.N.Y. 2015) (finding that the Republic of Kazakhstan, as a sovereign, qualifies as an "interested person" under Section 1782 and noting that, "[t]o deny foreign governments the ability to utilize this statute is hardly conducive to encouraging cooperation and reciprocal treatment of the United States in the international arena" (cleaned up)); *In re Republic of Ecuador*, No. C-10-80225 MISC CRB, 2010 WL 4973492, at *6 (N.D. Cal. Dec. 1, 2010) (finding that the Republic of Ecuador, as a foreign sovereign, qualifies as an "interested person" within Section 1782 and stating that, if "an official with authority may seek assistance under § 1782 on the sovereign's behalf, it makes no logical sense to hold the sovereign may not do so on its own behalf"); *Matter of Governmentt of Mongolia v. Itera International Energy, L.L.C.*, No. 3:08-MC-46-J-32MCR, 2009 WL 10712603, at *9 (M.D. Fla. Nov. 10, 2009) (finding that Mongolia, as a sovereign,

qualifies as an "interested person" under Section 1782)*;see also In re Letter of Request from Crown Prosecution Serv. of United Kingdom*, 870 F.2d 686, 690 (D.C. Cir. 1989) ("A foreign legal affairs ministry, attorney general, or other prosecutor, courts have repeatedly held, fits squarely within the section 1782 'interested person' category.")

As a sovereign, the MML has exclusive, formal channels to submit evidence to the fiscal and special prosecutors (also known as the state *procuradores*) in the Criminal Proceedings and Contemplated Criminal Proceeding.  Peruvian Counsel Decl. at ¶ 29.  The MML does so through the Public Prosecutor of the MML (also called the Procurador of the MML).  *Id.*  These channels exist through the MML's vested interest in proceedings that impact its constituents.  *Id.*  The channels are tailored to the MML's governance structure, allowing for a distinct level of coordination and access not available to other parties or persons.  *Id.*  The MML will submit evidence obtained from this Application through those channels for use in the Criminal Proceedings and Contemplated Criminal Proceeding.  *Id.*  Additionally, the fiscal and special prosecutors will give substantial weight to information provided by the Public Prosecutor of the MML, who speaks on behalf of the capital of Peru.  *Id.*

*Second*, the MML is also an "interested person" because it will have meaningful participation rights in the Concession Contract Corruption Case, the Rutas Money Laundering Case, the Villarán Bribery Case, and the Brookfield Money Laundering Investigation as an "aggrieved party" under Peruvian law.  *Id.* at ¶¶ 7, 16, 30–32.  An applicant that has a "significant role" in the proceedings "possess[es] a reasonable interest in obtaining [judicial] assistance," and "therefore qualifies as an "interested person.'"  *Intel*, 542 U.S. at 256.  Meaningful participation rights include the right to "submit information," challenge a decision to "discontinue[] the investigation," and challenge any decision to "dismiss[] the complaint."  *Id.*  Under Peruvian law,

"aggrieved parties" have significant participation rights in proceedings. Peruvian Counsel Decl. at ¶¶ 26, 28–32. The MML qualifies as an "aggrieved party" because it was a party to the Concession Contract and was "directly offended by the crime or harmed by the consequences of it." *Id.* at ¶ 30. The MML therefore intends to seek this status and is likely to obtain it. *Id.*

As an aggrieved party to the Contemplated Criminal Proceeding and the Criminal Proceedings in the preparatory investigation and accusation phases, the MML will have the right to: (1) be informed about the progress of the investigations; (2) submit evidence, such as documentary evidence and witness testimony; (3) obligate the fiscal to consider that evidence; (4) request that the fiscal gather specific evidence or take certain actions, such as seeking warrants to obtain evidence that bolsters the case; (5) advocate for the MML's interests by highlighting the importance of certain evidence; (6) challenge the admissibility of evidence presented by others during the investigation; (7) participate in hearings or proceedings related to the investigation; (8) challenge any decision by a fiscal to discontinue an investigation; and (9) participate in the control de acusación hearing by presenting arguments supporting the fiscal's accusation or challenging attempts to dismiss the case. *Id.* at ¶¶ 13, 15, 31. The MML will similarly have participation rights in the Criminal Proceeding going to trial. *Id.* at ¶ 32. "[T]hrough coordination with the fiscal, [the MML] can submit evidence, such as additional documents and testimony, that strengthen the fiscal's case," and the judge will be required to consider this evidence. *Id.* at ¶¶ 16, 32.

Lastly, in its request to the Peruvian judge for aggrieved party status, the MML intends to include any helpful evidence obtained through this Application, and request its admission in the Criminal Proceedings and Contemplated Criminal Proceeding. *Id.* at ¶¶ 30, 33. The Peruvian

judge will therefore consider the evidence for use in those proceedings.  *Id.* at ¶¶16, 32–33, 48–49.[31]

These rights are substantial and sufficient to confer the MML with the status of an "interested person."  *See Intel*, 542 U.S. at 256.

## II.     Each of the Discretion Factors Weighs Strongly in Favor of Granting the Application

Where, as here, an application satisfies the statutory requirements, the district court also considers several discretionary factors in determining whether to grant or deny the application. Those factors are: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the receptivity of the foreign tribunal to federal court assistance; (3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions; and (4) whether the request is unduly intrusive or burdensome.  *Id.* at 264–65.

In weighing those factors, the Court should keep in mind the "twin aims" of the statute: providing an efficient means of assistance to participants in international litigation in our federal courts, and encouraging foreign countries by example to provide similar means of assistance to our courts.  *See In re Application of Grupo Qumma*, No. M 8-85, 2005 WL 937486, at *4 (S.D.N.Y. Apr. 22, 2005) ("Section 1782's 'underlying policy should generally prompt district courts to provide some form of discovery assistance.'") (quoting *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995) ("*Euromepa I*"); *see also Application of Malev Hungarian Airlines*, 964 F.2d 97, 100, 102 (2d Cir. 1992) (noting "twin aims" of statute in reversing district court's denial of discovery under 28 U.S.C. § 1782).  Indeed, "the statute has, over the years, been given increasingly broad applicability." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76,

---

[31] The evidence does not even need to be admissible in the foreign court for purposes of Section 1782.  *See Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) ("there is no statutory basis for any admissibility requirement").

80 (2d Cir. 2012).

### A. The Discovery Subjects Are Not Participating in the Criminal Proceedings or Contemplated Criminal Proceeding

The first discretionary factor weighs in favor of granting the requested discovery because the Discovery Subjects are not participants in the Criminal Proceedings or Contemplated Criminal Proceeding. *See* Peruvian Counsel Decl. at ¶ 51. The Supreme Court has recognized that "nonparticipants in the foreign proceeding may be outside of the foreign tribunal's reach; hence their evidence, available in the United States, may be unobtainable absent 28 U.S.C. § 1782(a) aid." *Intel*, 542 U.S. at 264; *see also In re Application Pursuant to 28 U.S.C. Section 1782 for an Ord. Permitting Christen Sveaas to Take Discovery from Dominique Levy, L & M Galleries & other non-participants for use in Actions Pending in the Norway*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008) (finding a respondent's "status as a non-party in the foreign actions weighs in favor of granting [the] application."); *In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 292 (S.D.N.Y. 2008) (holding that the first discretionary factor favored granting of the application where the respondent was not subject to the jurisdiction of the foreign tribunals).

Here, the Discovery Subjects are not parties to the Criminal Proceedings or Contemplated Criminal Proceeding. *See* Peruvian Counsel Decl. at ¶ 51. Under similar circumstances, courts in this District have granted Section 1782 applications to take discovery from CHIPS, the Fed-NY, and other similarly situated discovery subjects. *See In re Vinmar Overseas, Ltd.*, 2020 WL 4676652, at *1 (granting a 1782 application to take discovery from CHIPS because it was not a party to the foreign proceedings); *see also* Order, *In The Matter of the Ex Parte Application of Andrew Reginald Yeo and Gess Michael Rambaldi*, 1:18-MC-483, ECF No. 6 (S.D.N.Y. 2018) (granting discovery pursuant to Section 1782 from the Federal Reserve Bank). This Court should do the same here.

Although Brookfield Peru—a Brookfield affiliate—is involved in the Contemplated Criminal Proceeding, "this does not alter the analysis because [p]arent companies of non-U.S. participants in foreign proceedings are separate legal entities for purposes of Section 1782 applications." *In re Aguila Energia e Participacoes Ltda.*, No. CV 22 MISC. 228 (RA) (SLC), 2023 WL 7001445, at *4 (S.D.N.Y. Aug. 22, 2023) (cleaned up)); *see also In re Evenstar Master Fund SPC for & on behalf of Evenstar Master Sub-Fund I Segregated Porftfolio*, No. 20MISC00418CSJCM, 2021 WL 3829991, at *11 (S.D.N.Y. Aug. 27, 2021) ("*Evenstar*") ("[D]iscovery is not necessarily inappropriate under the first *Intel* factor simply because it is sought from a U.S.-based party that is affiliated with the applicant's foreign adversary. . . . This is because entities who are 'participants' in foreign proceedings are 'separate legal entities from their subsidiaries and affiliates for the purpose of Section 1782 motions.'").

### B. The Nature of the Court, the Character of the Proceeding, and the Receptivity of the Court Support Granting the Discovery Requested

Applicants enjoy a presumption in favor of this factor.  In examining receptivity, a U.S. court should limit its inquiry "only [to] authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782," and not engage in "speculative forays into legal territories unfamiliar to federal judges." *Euromepa I*, 51 F.3d at 1099–100.  This includes forays into whether the evidence is *discoverable* or *admissible* in the foreign proceeding.  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) (explaining that "the Supreme Court rejected the so-called foreign-discoverability rule" and concluding that "there is no statutory basis for any admissibility requirement" as well); *Euromepa I*, 51 F.3d at 1101 ("[T]he drafters of section 1782 regarded it as both unnecessary and undesirable to let the propriety of discovery with the aid of an American court depend on discoverability and admissibility under foreign law.") (cleaned up).

"Authoritative proof" that a foreign tribunal would reject evidence obtained with the aid of Section 1782 is limited to proof "embodied in a forum country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures." *Id.* at 1100. No such proof exists here. Peruvian Counsel Decl. at ¶¶ 45–48. To the contrary, the Peruvian tribunals would be receptive to the documentary evidence sought in this Application. *Id.* at ¶¶ 45–50. Indeed, this is especially true in the context of corruption investigations and criminal misconduct, "where international collaboration has been key to uncovering cross-border misconduct." *Id.* at ¶ 45.

Plus, Courts have authorized Section 1782 discovery requests for use in proceedings such as these. *See, e.g.*, *Campos-Alvarez v. Newmont Mining Corp.*, No. 1:14-CV-00208-REB, 2015 WL 1228262, at *2 (D. Colo. Mar. 16, 2015) (granting Section 1782 application for discovery for use in Peruvian criminal investigation and noting "there is no indication that the Peruvian courts would not be receptive to relevant information gathered from the respondents in this federal district"); *Consorcio Minero S.A. v. Doe Run Res. Corp.*, No. 4:11-MC-583 CEJ, 2011 WL 4550200, at *4 (E.D. Mo. Sept. 30, 2011) (similarly granting Section 1782 application for discovery for use in Peruvian criminal investigation).

In addition, when the MML seeks recognition as an aggrieved party, the MML will seek to introduce the evidence in support of its application. There would be no basis to challenge admissibility of the documentary evidence before the Peruvian courts, and such evidence is routinely used by Peruvian courts in criminal proceedings. Peruvian Counsel Decl. at ¶ 50. The discovery is essential to developing evidence and information about the perpetrators of the corruption and criminal misconduct. *Id.*

## C.  The MML Does Not Seek to Circumvent Proof-Gathering Restrictions or Other Policies

The MML seeks this discovery in good faith and is not attempting to circumvent the foreign tribunal's proof-gathering restrictions.  Typically, courts weigh the third *Intel* factor against the applicant only where they find that an application is brought in bad faith.  *See In re Application of Hill*, No. 05CV999996, 2007 WL 1226141, at *3 (S.D.N.Y. Apr. 23, 2007) ("Absent any indication of bad faith on [the applicant's] part, the Court is simply unwilling to weigh the request for 28 U.S.C. § 1782 assistance itself as a negative discretionary factor.") (internal quotations omitted); *see also In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf*, No. Civ. M19-88 (BSJ), 2006 WL 3844464, at *7 (S.D.N.Y. Dec. 29, 2006).

Indeed, courts have granted Section 1782 applications even when the discovery sought was unavailable in the foreign jurisdiction or when the applicant has not first tried to obtain the discovery overseas.  *See, e.g.*, *In re Mangouras*, No. 17-MC-172, 2017 WL 4990655, at *6–7 (S.D.N.Y. Oct. 30, 2017).  As mentioned previously, Peruvian courts routinely welcome discovery obtained under Section 1782, and the courts in the Criminal Proceedings and Contemplated Criminal Proceeding would likely welcome such discovery.  Peruvian Counsel Decl. at ¶ 50.

Since the Application is brought in good faith and does not seek to circumvent the discovery procedures of the Criminal Proceedings and Contemplated Criminal Proceeding, the third factor also weighs in favor of granting the Application.

## D.  The Requested Discovery Is Narrowly Tailored, and Is Not Unduly Intrusive or Burdensome

Section 1782 provides that discovery taken under the statute is governed by the Federal Rules of Civil Procedure.  28 U.S.C. § 1782(a).  Thus, the Court "should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule

42

26 of the Federal Rules of Civil Procedure." *See Mees*, 793 F.3d at 302. Further, the scope of permissible discovery under Fed. R. Civ. P. 26 provides, in part, that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense— including the existence, description, nature, custody, condition, and location of any documents." *In re Application of Michael Wilson & Partners*, No. 06-cv-02575-MSK-KMT, 2009 WL 1193874, at *2 (D. Colo. Apr. 30, 2009) (citations omitted).

As described previously, the documents and depositions the MML requests are relevant and narrowly tailored to the Criminal Proceedings and Contemplated Criminal Proceeding in Peru. Peruvian Counsel Decl. at ¶¶ 34–42; Exs. A, C–K. The MML seeks depositions, along with documents, concerning Brookfield's due diligence, financial transactions, and other information needed to further support the existence of corruption in the Concession Contract. Peruvian Counsel Decl. at ¶¶ 6, 34–42; Exs. B, L. The temporal scope of the requested discovery targets specific activities relevant to this case, such as the illegal "success fee" paid for the financial closing of Rutas (2014–2019),[32] Brookfield Infrastructure's acquisition of Rutas and discovery of corruption issues (2012–2016),[33] other entities' involvement in the due diligence in connection with the 2016 acquisition (2016), Odebrecht's continued control over Rutas after Brookfield Infrastructure's acquisition (2016–present), and wire transfer records for individuals and entities believed to have continued their involvement in the corruption (2017–present).

Additionally, the MML seeks the types of records that the Discovery Subjects maintain

---

[32] The success fee was paid in 2014. Ex. 33. In 2019, Kuczynski, one of the ultimate recipients of this fee, was ordered to pre-detention on corruption charges involving Odebrecht. *See Peruvian judge orders ex-President Kuczynski to pre-trial jail for three years*, REUTERS (Apr. 19, 2019), https://www.reuters.com/article/world/peruvian-judge-orders-ex-president-kuczynski-to-pre-trial-jail-for-three-years-idUSKCN1RW01Y/.

[33] In 2012, Brookfield Infrastructure considered purchasing a minority stake in Rutas. Ex. 38 at ¶ 24. And in 2016, Brookfield Infrastructure purchased the controlling shares in the company. *Id.* at ¶ 50.

and produce in the regular course of business.[34]  The MML's requests are relevant and narrowly

tailored.  Indeed, courts in this district have previously granted similar requests.  *See, e.g.*, Order,

*In re Cooperatieve Rabobank*, No. 1:20-MC-89 (AKH), ECF No. 11 (S.D.N.Y. Feb. 18, 2020)

(granting discovery pursuant to Section 1782 from CHIPS); *Evenstar*, 2021 WL 3829991, at *14

(granting Section 1782 application requesting Rule 30(b)(6) depositions and documents).

Additionally, to the extent that the Discovery Subjects find the discovery requests to be

burdensome or intrusive, they may make a specific showing to that effect.  *See In re Application

of Inversiones y Gasolinera Petroleos Venezuela S. de R.L.*, No. 08-20378-MC, 2011 WL 181311,

at *13 (S.D. Fla. Jan. 19, 2011) (allowing discovery under Section 1782 absent "specific showing"

of burdensome or intrusive nature of request by respondent); *cf. In re Letters Rogatory from Tokyo

Dist., Tokyo, Japan*, 539 F.2d 1216, 1219 (9th Cir. 1976) (noting that a subpoenaed party can

"raise . . . objections and exercise . . . their due process rights by motions to quash the subpoena").

Therefore, the final factor also weighs in favor of granting the Application.

## THE APPLICATION IS MADE ON NOTICE TO THE DISCOVERY SUBJECTS

While Section 1782 applications are typically filed *ex parte*, the Applicant is providing

notice to the Discovery Subjects.[35]

## CONCLUSION

WHEREFORE, the MML asks that this Court:

(1) Grant discovery pursuant to 28 U.S.C. § 1782; and

(2) Authorize the issuance of the subpoenas attached to the Declaration of Scott Curtis

---

[34] In fact, the Clearing House dedicates a page on its website to instructions for subpoenas.  *See* Subpoena Instructions, THE CLEARING HOUSE, https://www.theclearinghouse.org/about/subpoena-instructions.

[35] Applicant is providing notice by personally serving an as-filed copy of the Application on the Discovery Subjects. CHIPS and Fed-NY, which customarily accept service via email, are being served at their respective email addresses.

Nielson.

Dated:    November 18, 2024
          New York, New York

                                        Respectfully submitted,

                                        **BOIES SCHILLER FLEXNER LLP**

                                        _/s/ E. Martin De Luca_____
                                        E. Martin De Luca
                                        mdeluca@bsfllp.com

                                        Scott Curtis Nielson
                                        snielson@bsfllp.com

                                        Nazly Duarte Gomez
                                        nduartegomez@bsfllp.com

                                        Boies Schiller Flexner LLP
                                        55 Hudson Yards
                                        New York, NY 10001
                                        Tel: (212) 446-2300
                                        Fax: (212) 446-2350

                                        Blake C. Goebel*
                                        bgoebel@bsfllp.com
                                        Boies Schiller Flexner LLP
                                        1401 New York Ave, NW
                                        Washington, DC 20005
                                        Tel: (202) 895-5248
                                        Fax: (202) 237-6131

                                        Rossana Baeza*
                                        rbaeza@bsfllp.com
                                        Boies Schiller Flexner LLP
                                        100 SE Second Street, Suite 2800
                                        Miami, FL 33131
                                        Tel: (305) 539-8400
                                        Fax: (305) 539-1307

                                        * Application to appear *pro hac vice*
                                        forthcoming

                                        *Attorneys for Applicant*
                                        *Metropolitan Municipality of Lima*