UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  5/27/2025
```

------------------------------------------------------------------X
:
In Re: BROOKFIELD INFRASTRUCTURE                  :
PARTNERS L.P., et. al.                            :          24-mc-533 (LJL)
:
------------------------------------------------------------------X        OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

      Respondents Brookfield Infrastructure Partners L.P., Brookfield Asset Management Ltd. and Brookfield Corporation (the "Brookfield Entities") move, pursuant to 28 U.S.C. § 1782 and Federal Rule of Civil Procedure 45(d), for an order vacating this Court's *ex parte* Order that granted the Application of the Metropolitan Municipality of Lima ("MML") for discovery under 28 U.S.C. § 1782 (the "Section 1782 Order") and vacating all subpoenas issued under that order. Dkt. No. 38. Respondents The Bank of Nova Scotia, New York Agency, Scotia Capital (USA) Inc., and Scotia Holdings (USA) LLC (together, "Scotiabank US") and Cahill Gordon & Reindel LLP ("Cahill") also move for an order vacating the Section 1782 Order and quashing or modifying the subpoenas against them. Dkt. Nos. 32, 44.

      For the reasons that follow, the motions are granted.

## BACKGROUND

      MML is the local government authority for the Lima Metropolitan Area and the City of Lima, the capital and largest city of Peru. Dkt. No. 3 at 1 n.1. On April 16, 2010, a consortium of companies wholly owned by Odebrecht S.A. ("Odebrecht"), a Brazilian global industrial conglomerate, submitted a proposal to MML for a concession project involving the construction, operation, improvement and maintenance of certain urban roads in Lima. Dkt. No. 4-21 ¶ 82; *see Metro. Mun. of Lima v. Rutas de Lima S.A.C.*, 2024 WL 10711119, at *2 (D.D.C. Mar. 12, 2024). On September 18, 2012, MML awarded the concession project (the "Concession

Contract") to the consortium, later incorporated as Rutas de Lima S.A.C. ("Rutas").  Dkt. No. 5 (Declaration of Richard Allemant, "Allemant I") ¶ 5; Dkt. No. 4-21 ¶ 96–97.  The Concession Contract was intended to improve, build, and maintain highways in Lima in exchange for toll revenue collected on those roads.  Allemant I ¶ 5.  Odebrecht acted through Rutas to execute this project.  *Id.* ¶ 5.

In 2012, Brookfield, a Canadian global investment company, began considering an investment in the Rutas concession project.  Dkt. No. 4-64 ¶ 24.  In March 2016, Brookfield had an opportunity to acquire a controlling interest in Rutas through a competitive process run by Scotiabank.  *Id.* ¶ 25.  Brookfield performed due diligence from March 2016 to June 2016 to evaluate the risks associated with Rutas, including any anti-bribery and corruption ("ABC") issues, closing the transaction on June 28, 2016.  *Id.* ¶¶ 14, 30–31, 34, 35, 50.

In March 2016, Marcelo Odebrecht, Odebrecht's then-CEO, was sentenced to 19 years in prison for paying millions of dollars in bribes.  Dkt. No. 4-43.  The same month, a Peruvian public prosecutor opened investigations into links between Odebrecht and two Presidents of Peru.  Dkt. Nos. 4-44, 4-45.  A month later, Peru's special parliamentary commission for "Operation Car Wash" ("La Comisión Lava Jato") issued a preliminary report identifying Rutas as an Odebrecht project under investigation for corruption.  Dkt. No. 4-46 at 1–3.  In December 2016, Odebrecht entered into a plea agreement with the U.S. Department of Justice for paying bribes in connection with construction projects in various countries, including in Peru.  See Dkt. No. 4-14.  Odebrecht admitted to corruption in relation to four projects in Peru, none of which was the Rutas concession.  Dkt. No. 40-5.

Since 2018, Rutas and MML have engaged in extensive arbitration proceedings in Washington, D.C., related to Rutas' efforts to enforce the Concession Contract and MML's

efforts to avoid the contract on the basis that the contract and subsequent amendments were obtained through corrupt payments to Peruvian political leaders. *See Rutas*, 2024 WL 10711119, at *4–10. Two separate arbitral tribunals ruled in Rutas' favor, finding the Concession Contract valid and MML in breach, with two arbitration awards totaling $196 million. *Id.* at *1. A third tribunal preliminarily found for Rutas before MML initiated a criminal investigation against the arbitral panel for bias. *Id.* The District of Columbia District Court rejected MML's petition to vacate the two final awards and granted Rutas cross-petition to confirm both in March 2024. *Id.* That judgment is now on appeal to the United States Court of Appeals for the D.C. Circuit. *Metro. Mun. of Lima v. Rutas de Lima S.A.C.*, No. 24-7053 (D.C. Cir. Nov. 26, 2024).

MML seeks the Section 1782 subpoenas against Respondents ostensibly for use in connection with four Peruvian proceedings, as detailed below. The four proceedings have progressed to different stages within the Peruvian legal system.

In general, the four stages of criminal proceedings in Peru are: (i) the preliminary investigation stage, (ii) the preparatory investigation stage, (iii) the accusation or intermediate stage, and (iv) trial. Dkt. No. 42 (Declaration of Dino Carlos Caro Coria, "Caro I") ¶¶ 8, 12, 16, 18. The first stage, preliminary investigation, is initiated by a public prosecutor, either *sua sponte* or in response to the filing of a complaint, with a threshold of "simple suspicion." Allemant I ¶ 9. If, during the preliminary investigation, the prosecutor finds that the higher "revealing suspicion" standard has been met, the case is presented to a tribunal and the case progresses to the preparatory investigation stage. *Id.* ¶ 12. Next, in the accusation stage, the prosecutor presents the formal charges and relevant evidence to the judge with a request for trial, after which the judge decides whether the presented facts suggest "beyond a reasonable doubt"

that a crime was committed.  *Id.* ¶ 14.  If the judge so finds, the case progresses to a trial with the same "beyond a reasonable doubt" burden of proof.  *Id.* ¶ 16.

In criminal proceedings, an "aggrieved party" to the misconduct at issue has certain participation rights in each of these four stages based on the party's legal status as a victim or otherwise affected party of the particular crime alleged.  *Id.* ¶¶ 7, 9–16, 47; Caro I ¶¶ 22–24.  Aggrieved parties under Peruvian law are determined by statute according to the crime that is alleged.  Caro I ¶¶ 23, 32; Dkt. No. 39 (Declaration of Renzo Carrasco Domhoff, "Carrasco I") ¶ 7.  One who is not designated as an aggrieved party has no defined right to present evidence in the course of a prosecution.  Caro I ¶ 24.[1]

All four proceedings at issue here were initiated by the federal *Ad Hoc* Prosecutor's Office that was formed by the Peruvian government in order to conduct investigations stemming from "Operation Car Wash," the Brazilian investigation which originally exposed the Odebrecht's corruption.  Carrasco I ¶ 6–7; Dkt. No. 39-2.  The *Ad Hoc* Prosecutors specifically, and Peruvian federal prosecutors generally, are a distinct governmental entity from MML, which is a regional or local government without the authority to prosecute crime.  Caro I ¶ 25–30.  Peruvian federal prosecutors are both constitutionally and functionally autonomous within the Peruvian state, exercising independent discretion in the management and initiation of criminal proceedings.  *Id.* ¶ 26.

## I.    The Peruvian Actions

### A.    The "Brookfield Money Laundering Investigation" (29-2023)

On August 8, 2023, following the submission of a criminal complaint by MML, the *Ad Hoc* Prosecutor's Office initiated a preliminary investigation of alleged money laundering by

---

[1] A separate designation of "civil actor" also affords some right to present evidence, *see* Caro I ¶ 22 n.32, 24, but MML has neither claimed to have nor briefed the meaning of that status.

those responsible for Brookfield Infrastructure Group Peru S.A.C.  Allemant I ¶ 18; Carrasco I ¶¶ 5, 10–11.  The Brookfield Money Laundering investigation examines the circumstances of Brookfield Infrastructure's acquisition of a majority stake in Rutas, including whether the acquisition involved inadequate due diligence in purchasing Odebrecht's majority stake in Rutas, whether in doing so Brookfield Infrastructure violated its own ethical codes or anti-corruption policies, and whether Odebrecht has continued to exercise control over Rutas after selling its interest.  Allemant I ¶ 18.

This proceeding has not advanced beyond the preliminary investigation stage and has therefore yet to be presented to a tribunal.  Carrasco I ¶¶ 10–15.  To date, the prosecutor has not formally named any investigated parties.  *Id.* ¶¶ 13-14, 16-17.  The deadline for the prosecutor to determine whether the case would proceed to the preparatory investigation stage before a tribunal expired in April 2024.  *Id.* ¶ 16.  On February 16, 2024, the prosecutor unilaterally extended that deadline by 36 months.  *Id.* ¶ 17.  Brookfield's Peruvian entities challenged that unilateral extension but were unsuccessful.  *Id.*

###    B.    The "Villarán Bribery Case" (30-2017)

On November 24, 2017, the *Ad Hoc* Prosecutor's Office brought charges of bribery-related crimes and money laundering against the former Mayor of Lima Susana Villarán, other MML officials, and an Odebrecht executive.  Allemant I ¶ 22; Carrasco I ¶ 19, 22–24.  Villarán is alleged to have solicited approximately US $3 million in improper payments from Odebrecht in connection with the Concession Contract.  Allemant I ¶ 22.  The accused are Villarán, José Miguel Castro Gutiérrez, Domingo Arzubialde Elorrieta, Maria Julia Mendez Vega, Daniela Maguiña Ugarte, and José Adelmahiro Pinheiro Filho.  Carrasco I ¶ 5.  None of those persons are affiliated with any Brookfield entity, although Rutas is a civilly liable third party, which means that it is potentially subject to civil liability resulting from the outcome of the case.  *Id.* ¶ 5, 19.

The Villarán Bribery Case is in the accusation stage and is proceeding to trial after a judge found that the requisite evidentiary burden was met, but no trial date has yet been set. Carrasco I ¶ 21–22; Allemant I ¶ 16.  The charges are criminal association, collusion, bribery, incompatible negotiation, crimes against public faith, and money laundering.  Allemant I ¶ 23; Carrasco I ¶¶ 5, 22.

### C.    The "Rutas Money Laundering Case" (31-2017)

On December 7, 2017, the *Ad Hoc* Prosecutor's Office initiated an investigation of former Peruvian president Pedro Pablo Kuczynski and several others for money laundering related to Rutas' payment to Rutas' purported financial advisor, Gerardo Sepulveda, of an illegal "success fee" of US $3.5 million upon the financial closing of the Concession Contract. Allemant I ¶ 24; Carrasco I ¶ 5, 19.  The accused are Kuczynski, Sepulveda, Gloria Jesus Kisic Wagner, and Jose Luis Bernaola Nufflo.  Carrasco I ¶ 5.  None of the accused are affiliated with any Brookfield entity.  *Id.* ¶ 5.

The Rutas Money Laundering case is in the accusation stage.  Allemant I ¶ 24; Carrasco I ¶ 18–20.  The charge is money laundering.  Allemant I ¶ 25; Carrasco I ¶ 5.

### D.    The "Concession Contract Corruption Case" (448-2017)

In late 2017, the *Ad Hoc* Prosecutor's Office initiated an investigation relating to the Concession Contract between Rutas and MML, covering the potential overvaluation of construction works, unjustified modifications to mandatory projects, improper toll rate increases, and the implementation of compensation mechanisms.  Allemant I ¶ 27.  None of the investigated parties are affiliated with any Brookfield entity.  Carrasco I ¶ 5.[2]

---

[2] The accused in the Concession Contract Corruption Case are Villarán, Domingo Arzubialde Elorrieta, Juan Andrés Ramos Arapa, Carlos Fernando Steiert Goicochea, Juan José Neyra Montes, Miguel Alfredo Flores Dueñas, Daniela Canales Hernández, Norma Ana Montoya Blua,

The Concession Contract Corruption Case moved from the preliminary investigation stage to the preparatory investigation stage in September 2018 and continues in the preparatory stage. Allemant I ¶ 27. The charges are collusion, criminal association, and, alternatively, incompatible negotiation. *Id.*; Carrasco I ¶ 29.

## II.    Discovery Sought

Through its Section 1782 application, MML seeks documents from Brookfield, Scotiabank US, Cahill, and various U.S.-based financial institutions relating to BIP's acquisition of a majority stake in Rutas and the operation of the Concession Contract. Dkt. No. 3 at 18–19. From Brookfield, MML seeks documents from 2012 to present related to Brookfield's due diligence policies, procedures, and protocols; implementation and monitoring of those protocols in the course of the Rutas acquisition; bribery and corruption issues surfaced in the course of the Rutas acquisition; Brookfield's awareness of the Odebrecht investigations; and Brookfield's corporate structures and relationship to Odebrecht entities. Dkt. No. 4-1. From Scotiabank US, MML seeks documents from 2016 related to Scotiabank's role in managing the competitive process of the Rutas acquisition; awareness of potential bribery or corruption issues; internal due diligence policies and procedures; payments between Rutas, Brookfield, or Odebrecht; and communications with regulatory or government authorities related to the monitoring of the escrow accounts related to Rutas. Dkt. No. 4-5. From Cahill and KPMG, MML seeks documents from 2016 related to bribery or corruption issues relating to Rutas, Odebrecht, and the Concession Contract, including communications with government authorities, surfaced or exchanged during the course of Brookfield's due diligence of the Rutas acquisition. Dkt. No. 4-

---

Lucio Alva Matteucci, Jaime Villafuerte Quiróz, María Del Pilar Márquez Mares Ramos, Elizabeth Vilca Quispe, María Del Rosario Solís Martínez, Guillermo Segundo Gonzales Criollo, Alfieri Bruno Lucchetti Rodríguez, Liliana Martina Orozco Pinto-Bazurco, Demetrio Rojas García, and Raúl Javier Bueno Cano. Allemant I ¶ 27.

4, 4-4.  From Arup Latin America S.A., Arup Americas, Inc., and Citibank, N.A., MML seeks 2016 documents concerning transactions in the escrow accounts monitored by Arup as part of the Concession Contract and any related bribery and corruption issues.  Dkt. No. 4-6, 4-7.  From Wells Fargo, N.A. and JPMorgan Chase & Co., MML seeks documents from 2014 to 2019 related to transactions from an enumerated list of individuals and entities, including any bribery or corruption issues flagged in relation to those transactions, as well as policies governing the monitoring of suspicious activity during that time period.  Dkt. Nos. 4-7, 4-8.  From The Clearing House Payments Company L.L.C., and The Federal Reserve Bank Of New York, MML seeks documents from 2017 to present related to transactions processed on behalf of a list of entities and individuals.  , 4-9, 4-10, 4-11.

MML also seeks a 30(b)(6) deposition of the Brookfield entities and a deposition of Brookfield's COO.  Dkt. No. 3 at 19; Dkt. No. 4-1,  4-12.

## PROCEDURAL HISTORY

On November 18, 2024, MML filed this application for a Section 1782 order, Dkt. No. 1, alongside a memorandum of law, Dkt. No. 3, and the declarations of Scott Curtis Nielson, Dkt. No. 4, and Richard Allemant, Dkt. No. 5.

On November 22, 2024, the Court granted the application and authorized applicant to take the discovery referenced in the application.  Dkt. No. 12 (the "Section 1782 Order").  The Court stated:  "The grant of the Application is without prejudice to a challenge to the subpoenas, including their scope, and potential reconsideration of the application of the § 1782 factors."  *Id.* On January 10, 2025, motions to vacate the Section 1782 Order and the subpoenas issued under it were filed by Brookfield, Scotiabank US, and Cahill.  Dkt. Nos. 22, 38, 44.  Scotiabank US also filed a memorandum of law, Dkt. No. 33, and declarations of Jose Javier Ortiz Fuentes, Dkt. No. 35, and David M. Howard, Dkt. No. 36.  Brookfield filed a memorandum of law, Dkt. No.

41, and declarations of Renzo Carrasco Domhoff, Dkt. No. 39, David G. Hille, Dkt. No. 40, Dino

Carlos Caro Coria, Dkt. No. 42, and Benjamin Vaughan, Dkt. No. 43. Cahill joined in the facts

and arguments as set forth by Brookfield. Dkt. No. 44. On January 24, 2025, MML filed a

response in opposition to the motions to quash, Dkt. No. 47, accompanied by an additional

declaration of Richard Allemant, Dkt. No. 49. On February 3, 2025, Scotiabank US filed a reply

memorandum of law, Dkt. No. 60, accompanied by the declaration of Jose Luis Velarde, Dkt.

No. 61. On the same day, Brookfield filed a reply memorandum of law, Dkt. No. 62,

accompanied by the second declarations of Renzo Carrasco Domhoff, Dkt. No. 65, David G.

Hille, Dkt. No. 66, and Dino Carlos Caro Coria, Dkt. No. 64. Also on that day, Cahill filed a

joinder in Brookfield's reply. Dkt. No. 63.

## DISCUSSION

To be entitled to relief under Section 1782, applicants "must meet several statutory

requirements, including that '(1) the person from whom discovery is sought resides (or is found)

in the district of the district court to which the application is made, (2) the discovery is for use in

a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made

by a foreign or international tribunal or any interested person.'" *Mangouras v. Squire Patton

Boggs*, 980 F.3d 88, 97 (2d Cir. 2020) (quoting *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir.

2015)); *see In Re BonSens.org*, 95 F.4th 75, 79 (2d Cir. 2024).[3]

"Once the statutory requirements are met, a district court may order discovery under

§ 1782 in its discretion, taking into consideration the 'twin aims' of the statute, namely,

'providing efficient means of assistance to participants in international litigation in our federal

courts and encouraging foreign countries by example to provide similar means of assistance to

---

[3] Additionally, the statute requires that the discovery not be "in violation of any legally applicable privilege." 28 U.S.C. § 1782(a); *see In re Guo*, 965 F.3d 96, 102 n.3 (2d Cir. 2020).

our courts.'" *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 117

(2d Cir. 2015) (quoting *In re Metallgesellschaft*, 121 F.3d 77, 79 (2d Cir. 1997)); *see In re Pub.*

*Joint-Stock Co. Bank Otkritie Fin. Corp.*, 2023 WL 4928227, at \*2 (S.D.N.Y. Aug. 2, 2023).

The Supreme Court has set forth four factors for the Court to consider in the exercise of

its discretion:

> (1) whether "the person from whom discovery is sought is a participant in the
> foreign proceeding,"
>
> (2) "the nature of the foreign tribunal, the character of the proceedings underway
> abroad, and the receptivity of the foreign government or the court or agency
> abroad to U.S. federal-court judicial assistance,"
>
> (3) whether "the § 1782(a) request conceals an attempt to circumvent foreign
> proof-gathering restrictions or other policies of a foreign country or the United
> States," and
>
> (4) whether the requested discovery is "unduly intrusive or burdensome."

*BonSens*, 95 F.4th at 80 (quoting *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-

65 (2004)).  If an application fails on the statutory requirements, the district court need not

evaluate the discretionary factors.  *See BonSens*, 95 F.4th at 81–82 ("Having concluded that the

district court did not err in determining that the 'for use' prerequisite was not met, we can

identify no abuse of discretion in the district court's decision to forgo consideration of the *Intel*

factors.")

The Brookfield entities, Scotiabank US, and Cahill (collectively, "Respondents") argue

that MML is not an "interested person" and the requested discovery is not "for use in a foreign

proceeding" within the meaning of Section 1782.  Dkt. No. 33, 41, 44.  They also argue that the

Court should exercise its discretion to reject MML's Section 1782 request because the

application reflects an improper attempt to circumvent U.S.-law restrictions on evidence

gathering, Dkt. No. 41 at 28–34, and because the requests are unduly intrusive and burdensome, Dkt. No. 41 at 34–39.

## I.    Statutory Factors

### E.    Interested Person

Section 1782 permits applications by a "foreign or international tribunal" or an "interested person" in the foreign proceeding.  28 U.S.C. § 1782.  MML does not argue that that it qualifies as a tribunal, but rather that "as a sovereign and as an aggrieved party to th[e] proceedings," it should be considered an "interested person" in all four proceedings.  Dkt. No. 3 at 25.  However, the law does not support MML's contention that sovereignty alone suffices for qualification as an "interested person," nor does MML demonstrate that it is actually an "aggrieved party" in any of the four proceedings within the meaning of Peruvian law.

A party need not be a named litigant in a foreign proceeding in order to be considered an "interested person" under Section 1782.  *See Intel*, 542 U.S. at 256 ("'[U]pon the application of any interested person,' plainly reaches beyond the universe of persons designated 'litigant.'").  However, whether a party may be considered an "interested person" turns on whether the applicant has legal rights in the foreign proceeding akin to a litigant's, even if they are not themselves a named litigant.  In concluding that "interested persons" are not limited to litigants*, the Supreme Court in *Intel* reasoned that the applicant in that case, the complainant who had prompted the European Commission investigation and later adjudicatory proceeding for which discovery was sought, should be considered an "interested person" because they "ha[d] the right to submit information for the [European Commission's] consideration" and could "proceed to court if the Commission discontinues the investigation or dismisses the complaint."  *Id.*[4]  "[T]he

---

[4] The Supreme Court in *Intel* "did not lay down minimum requirements or tests to be met in

ability to simply pass on information to parties in a proceeding, without more, cannot confer

'interested person' status," any more than "the ability of amicus counsel to pass along evidence

and arguments to counsel representing one of the parties in litigation." *Certain Funds*, 798 F.3d

at 120; *see also IJK Palm LLC v. Anholt Servs. USA, Inc*., 33 F.4th 669, 678 (2d Cir. 2022)

(stating same and quoting *Certain Funds*, 798 F.3d at 120).  Rather, the applicant generally must

demonstrate either "an established right to provide evidence and have the party consider it, as the

§ 1782 applicant had in *Intel*, 542 U.S. at 256, or a recognized relationship, such as that of an

agent and principal." *Certain Funds*, 798 F.3d at 120 (emphasis in original); *see IJK Palm LLC*,

33 F.4th at 679; *In re B&C KB Holding GmbH*, 2023 WL 1777326 at *3 (S.D.N.Y. Feb. 6, 2023)

( As the "alleged victim of the fraud," § 1782 applicant "ha[d] the right to submit evidence to the

prosecutors in both criminal proceedings" and "[was] thus an 'interested person' within the

meaning of the statute."); *In re Klein*, 2023 WL 8827847, at *9 (S.D.N.Y. Dec. 21, 2023)

(quashing § 1782 subpoenas when "the most [the applicant] appears able to do is to forward the

evidence he obtains to the Criminal Authority, which, exercising its discretion, will decide

whether to initiate a formal criminal prosecution"); *In re Sargeant*, 278 F. Supp. 3d 814, 823

(S.D.N.Y. 2017) (denying § 1782 application where applicant had "not shown any such right to

direct [the party to the foreign proceeding's] consideration of this evidence or any recognized

relationship between [the party] and him that would permit him to do so").  In this respect, the

inquiry under the "interested person" analysis dovetails with the "for use" analysis, in the sense

that both require the "practical ability of an applicant to place a beneficial document—or the

information it contains—before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d

---

determining whether the party seeking discovery is an 'interested person.'" *Certain Funds*, 798
F.3d at 118.

121, 131 (2d Cir. 2017); *see Certain Funds*, 798 F.3d at 118 (finding "considerable overlap between" the "interested person" and "for use" requirements on the grounds that both involve "the applicant's ability to use the evidence it sought in the U.S. courts before the foreign administrative tribunal").

Though MML argues that its status as a sovereign suffices to make it an "interested person" in the foreign proceedings as it has a "vested interest in proceedings that impact its constituents," the law does not support that conclusion. In the cases MML cites, the sovereign in question was also the litigating or prosecuting party in the foreign proceeding, which is not the case for MML in any of the Peruvian criminal proceedings at issue here. *See In re Republic of Kazakhstan*, 110 F. Supp. 3d 512, 513-14 (S.D.N.Y. 2015) (Kazakhstan was appellant in the foreign civil proceeding); *In re Republic of Ecuador*, 2010 WL 4973492, at *1 (N.D. Ca. Dec. 1, 2010) (Ecuador was respondent in the foreign arbitration proceeding); *Gov't of Mongolia v. Itera Int'l Energy*, 2009 WL 10712603, at *1 (Mongolia was respondent in the foreign arbitration proceeding); *In re Letter of Request From Crown Pros. Serv. of the United Kingdom*, 870 F.2d 686, 689–90 (D.C. Cir. 1989) (the United Kingdom's Crown Prosecution Service was the prosecuting authority in the foreign criminal proceedings). The law requires more than that a person has an interest in litigation in colloquial sense for it to be an "interested person" under the law. Even as a sovereign, MML must demonstrate "an established right to provide evidence and have the party consider it" or a principal-agent relationship in order to be considered an "interested person." *Certain Funds*, 798 F.3d at 120.

MML argues that as a sovereign it "has exclusive, formal channels to submit evidence" to the public prosecutors, channels authorized by Peruvian law and "not available to other parties or persons," Dkt. No. 3 at 36; Dkt. No. 49 (Supplemental Declaration of Richard Allemant,

"Allemant II") ¶ 4. MML does not establish that such channels convey a legal right to submit evidence in the four proceedings. MML claims that the public prosecutors "will give substantial weight to information provided" by MML by virtue of its sovereignty, Dkt. No. 3 at 36, but that claim appears to represent a prediction about how the *Ad Hoc* Prosecutor's Office would respond to evidence received as a result of Section 1782 subpoenas, rather than an assertion of a right to have such evidence considered by the relevant tribunals in the four proceedings as would be required under Section 1782, *see Certain Funds*, 798 F.3d at 121 ("[T]he [applicants] are not in a position to direct the [litigant] to consider their evidence or submit that evidence to the tribunal," having only established "at best, that the [applicants] can furnish information *in the hope* that it might be used." (emphasis in the original)).

Nor does MML's sovereign status establish or imply that MML has a principal-agent relationship with the *Ad Hoc* Prosecutor's Office such it would have a right to direct the injection of information into the four proceedings. *See* Dkt. No. 47 at 5–6 (characterizing relationship between MML and Ad Hoc Prosecutor's Office as "collaborat[ion]" and "coordination"). MML makes no claim to have been deputized by the *Ad Hoc* Prosecutor's Office to act on its behalf to gather evidence in support of any of these four proceedings. *See RTI Ltd. v. AldiMarine Ltd.*, 523 F. App'x. 750, 751–52 (2d Cir. 2013) (finding that applicant was not an "interested person" under a principal-agent theory where there was no showing, for example, "of the [principal's] agreement with [the agent,] confirma[tion] that [the agent was] acting here on behalf of [the principal,] . . . and state[ment] that the agreement was expressly approved" by the foreign court).

Separately, MML argues that as an "aggrieved party" under Peruvian law in each of the four proceedings at issue, it *would have* meaningful participation rights that would afford it the status of "interested party" within the meaning of *Intel*. Dkt. No. 3 at 36–38. The subjunctive is

critical. Under Peruvian law, "aggrieved parties" who have been "directly offended by the offense or harmed by the consequences of the offense," Código Procesal Civil ("CPC") Art. 94.1, have some procedural rights in criminal prosecutions, including the right to provide evidence in support of the prosecution and to have that evidence be considered by the prosecuting authority. Allemant I ¶ 31; Caro I ¶ 24. However, MML has not established that it is an "aggrieved party" in these four proceedings. Dkt. No. 41 at 19–20.[5]

In its application and attached declaration of Peruvian counsel, MML walks an artful line in suggesting that "MML is also an 'interested person' because it *will have* meaningful participation rights in" the four proceedings, Dkt. No. 3 at 36 (emphasis added). It states that "[u]nder Peruvian law, 'aggrieved parties' have significant participation rights in proceedings" and "MML qualifies as an 'aggrieved party' because it was a party to the Concession Contract and was 'directly offended by the crime or harmed by the consequences of it,'" and "therefore intends to seek this status and is likely to obtain it" in all four proceedings. *Id.* (quoting CPC art.

---

[5] Because MML has not established that it is or could be an "aggrieved party" in any of the four proceedings, the Court need not determine whether "aggrieved party" status if recognized by a Peruvian tribunal would suffice to establish an applicant as an "interested person" within the meaning of Section 1782, but it seems likely that it would. MML submits that "aggrieved parties" under Peruvian law have the right to: (1) be informed about the progress of the investigation; (2) submit evidence, such as documentary evidence and witness testimony; (3) obligate the public prosecutor to consider that evidence; (4) request that the public prosecutor gather specific evidence or take certain actions, such as seeking warrants to obtain evidence that bolsters the case; (5) advocate for the interests of the "aggrieved party" by highlighting the importance of certain evidence; (6) challenge the admissibility of evidence presented by others during the investigation; (7) participate in hearings or proceedings related to the investigation; (8) challenge any decision by a public prosecutor to discontinue an investigation; and (9) participate in the accusation hearing by presenting arguments supporting the public prosecutor's accusation or challenging attempts to dismiss the case. *See* Allemant I ¶¶ 13, 15, 31. Respondents quibble with but do not substantively dispute this characterization, *see* Caro I ¶ 24 (discussing the interplay between Article 95 and Article 377 of the CCP), and it appears that such rights would bring an applicant within the definition of "interested person" set out in *Intel* and *Certain Funds*.

94).  But MML recognizes that the status of "aggrieved party" must be sought from the judge

presiding over the proceeding, Allemant I ¶ 33, noting that it intends to "include any helpful

evidence obtained through this Application" "in its request to the Peruvian judge for aggrieved

party status."  Dkt. No. 3 at 37.  Respondents point out, and MML concedes, that MML has in

fact neither sought nor received "aggrieved party" status in any of the four proceedings.

Carrasco I ¶ 7; Caro I ¶ 34; Allemant II ¶ 10.

    Moreover, MML has not established that it would qualify for "aggrieved party" status

even if it applied to be recognized as such.  MML's Peruvian counsel in his first declaration cites

to the code section, CPC art. 94, which describes "aggrieved parties" as those who have been

"directly offended by the crime or harmed by the consequences of it," arguing that on its face,

MML qualifies for recognition as an "aggrieved party" in all four proceedings as the

counterparty to the Concession Contract in dispute.  Allemant I ¶ 30.  However, as Respondents'

Peruvian counsel point out, CPC art. 94 is not the only provision of Peruvian law which bears on

the status of "aggrieved party."  Peruvian law distinguishes between "aggrieved parties" and

those persons or entities which have merely "denounced" (i.e., filed a complaint for) a crime.

Caro I ¶¶ 22–24; Carrasco I ¶ 15; Dkt. No. 64 (Supplemental Declaration of Dino Carlos Caro

Coria, "Caro II") ¶ 12; Dkt. No. 65 (Supplemental Declaration of Renzo Carrasco Domhoff,

"Carrasco II") ¶¶ 14–15.  Under Peruvian law, criminal complainants, without more, do not have

the right to submit evidence that must be considered by the federal prosecutor for submission to

the courts.  Caro I ¶¶ 22–24; Caro II ¶¶ 12-16; Carrasco II ¶¶ 13–20.  The status of "aggrieved

party" is determined with reference to the specific crime alleged.  Caro I ¶¶ 23, 32; Carrasco I ¶

7.  In the case of institutional crimes such as corruption, bribery, or money laundering, the status

of "aggrieved party" is reserved for the state prosecutor's office charged with the prosecution of

the offense in question, who is responsible for representing the public interests affected by the crime.  Caro I ¶ 23 (citing CCP, Arts. 384, 393–399).  For such crimes, the representation of the "aggrieved party" before the tribunal is vested exclusively in the designated Prosecutor's Office for the offense in question, which assumes procedural representation and defense at trial of the State's interests.  Caro I ¶ 23 (citing CCP, Art. 94(1); Legislative Decree No. 1326 of January 5, 2017, Art. 25; C. San Martín Castro, *Lecciones de Derecho Procesal Penal* 246–248 (2024); A. Peña Cabrera Freyre, *Exégesis del nuevo Código Procesal Penal* 388 (2006)).  MML, as a local government with functions prescribed under Articles 192 and 195 of the Constitution of the Republic of Peru, is not the Prosecutor's Office nor are its rights or responsibilities coterminous with the Prosecutor's Office, which is established under Article 159 of the Peruvian Constitution and in Article 60 of the CCP.  Caro I ¶¶ 25–26.

Turning first to the Brookfield Money Laundering Investigation (29-2023), MML has not shown that it would qualify as an "aggrieved party" even if it sought that status, which it has not yet done.  The Brookfield Money Laundering Investigation, which commenced after MML made a criminal complaint, is still in the preliminary investigation stage.  Carrasco I ¶¶ 10–15.  Unlike a criminal complainant, an "aggrieved party" does have a right to challenge a public prosecutor's decision to dismiss a case at this stage.  *See* Allemant I ¶ 11 (citing CPC art. 334).  However, the crime being investigated in the Brookfield Money Laundering Investigation is money laundering.  Carrasco I ¶¶ 11.  As defined under Peruvian law, money laundering is an institutional crime in which only the State,  not MML, is a possible victim or "aggrieved party."  Caro I ¶ 32.  Accordingly, MML would not be an "interested person" for the purposes of the Brookfield Money Laundering Investigation with a right to submit evidence—even apart from the question,

discussed in greater detail below, of whether a case in the preliminary investigation stage may even be considered a "foreign proceeding" within the meaning of Section 1782.

Turning next to the Villarán Bribery Case (30-2017), which is in the accusation stage but proceeding to the trial stage, MML has likewise failed to show that it has applied for or would qualify for "aggrieved party" status again with a right to submit evidence.  The charges in that case are criminal association, collusion, bribery, incompatible negotiation, crimes against public faith, and money laundering.  Allemant I ¶ 23; Carrasco I ¶¶ 5, 22.  All of these crimes are institutional crimes in which only the State,  not MML, is a possible victim or "aggrieved party." Caro I ¶ 32.  Respondents initially argued that MML had actually sought and been denied "aggrieved party" status in the Villarán Bribery Case, appealing that denial only to have the appeal dismissed.  Dkt. No. 41 at 19.  MML rejected this characterization, asserting that instead MML had made a procedural request in that case in August 2023 which the tribunal denied as procedurally improper because MML lacked the status of party, "aggrieved party" or otherwise. Allemant II ¶ 11.  Respondents appear to concede to MML's characterization.  Dkt. No. 62 at 5–6.  Regardless, the point remains that MML has not sought "aggrieved party" status in that case, and the fact that it was thwarted in an attempt to influence the Villarán Bribery Case by that lack of status as early as 2023 and still has not sought that status reinforces the Court's conclusion that MML should not benefit from what would amount to a *de facto* grant of that status by a court in the United States.  MML has not established that it is an "interested person" for the purposes of the Villarán Bribery Case.

Next, in relation to the Rutas Money Laundering Case, which is in the accusation stage, MML has not shown that it has applied for or would qualify for "aggrieved party" status.  The charge in that case is money laundering.  Allemant I ¶ 25; Carrasco I ¶ 5.  As stated above,

money laundering is an institutional crime in which only the State, not MML, is a possible victim or "aggrieved party." Caro I ¶ 32. Accordingly, MML has not established that it is an "interested person" for the purposes of the Rutas Money Laundering Case.

Finally, with respect to the Concession Contract Corruption Case, which is in its preparatory investigation stage, the charges are collusion, criminal association, and alternatively, incompatible negotiation. Allemant I ¶ 27.; Carrasco I ¶ 29. All of those crimes are institutional crimes in which only the State, not MML, is a possible victim or "aggrieved party." Caro I ¶ 32. Once again, MML has not shown that it has applied for or would qualify for "aggrieved party" status. MML has accordingly failed to establish that it is an "interested person" for the purposes of the Concession Contract Corruption Case.

MML's only response to the representations of Brookfield's Peruvian counsel, Caro, regarding qualification for "aggrieved party" status in each of the four proceedings is to reassert, on the declaration of its own Peruvian counsel, Allemant, that "MML qualifies as an 'aggrieved party' under article 94." Allemant II ¶ 9. But counsel does not dispute that MML has not been granted "aggrieved party" status and the mere *ipse dixit* of the expert does not establish that MML would so qualify in the face of the more specific discussion by Caro of crimes which are designated for the exclusive representation of the public prosecutor as the "aggrieved party." Simply reiterating, without more, that "MML Is an 'Aggrieved Party'" does not make it so. Allemant points to no statute, legislative decree, or caselaw which would tend to undermine Caro's explanation. MML's opposition urges that "[t]he Court should not vacate the Application based on a disagreement on the determination of Peruvian legal matters," citing *In re Furstenberg Fin. SAS*, for the proposition that U.S. courts should not "delve into a 'battle-by-affidavit of international legal experts' that turns on a prediction of 'the procedural or substantive

law of the foreign jurisdiction,' which is beyond the scope of a Section 1782 inquiry." 785 F. App'x 882, 885 (2d Cir. 2019). However, MML as the Section 1782 applicant bears the burden of showing that the statutory requirements are met, *see In re Navios S. Am. Logistics Inc.*, 2025 WL 887588, at *1 (S.D.N.Y. Mar. 21, 2025), and must offer the Court some reason to doubt the seemingly well-founded characterizations of Brookfield's Peruvian counsel—MML has not done so. Because MML has neither applied for nor shown that it would qualify for the status of "aggrieved party," and it has not shown that it would have the right to submit evidence or is in a principal-agent relationship with one who had such right, it cannot sustain its application under Section 1782 as an "interested person" in any of the four proceedings.

The conclusion that MML is not a "aggrieved party" is fatal to its Section 1782 application and requires the Court to vacate the Section 1782 order and to quash all of the subpoenas issued therein.[6] The Court considers Respondents' arguments that the evidence sought is not "for use in a foreign proceeding" and the arguments of Brookfield Corporation and BIP that the Court cannot exercise personal jurisdiction over them only for purposes of completeness. Because the statutory factors are dispositive, the Court need not proceed to analyze the discretionary factors set out in *Intel*. *See BonSens*, 95 F.4th at 81–82.

**F.    For Use in a Foreign Proceeding**

The statutory prerequisite that the discovery be "for use in a foreign proceeding" "assesses 'the *practical ability* of an applicant to place a beneficial document—or the

---

[6] Brookfield, Scotiabank US, and Cahill moved to vacate the Court's Section 1782 Order generally and to quash the subpoenas issued to themselves. *See* Dkt. No. 41 at 2; Dkt. No. 33 at 3; Dkt. No. 44 at 1. Brookfield has also moved to quash the subpoenas against all other targets. See Dkt. No. 41 at 2, 39–41. Accordingly, MML's failure to establish itself as an "interested person" is fatal to all of the subpoenas issued pursuant to the Court's Section 1782 order, including those against KPMG LLP, Arup Latin America S.A., Arup Americas, Inc., Citibank, N.A., Wells Fargo, N.A., JPMorgan Chase & Co., The Clearing House Payments Company L.L.C., and The Federal Reserve Bank Of New York.

information it contains—before a foreign tribunal.'" *BonSens*, 95 F.4th at 80 (quoting *Accent Delight*, 869 F.3d at 131). This is not a particularly onerous standard as the applicant must demonstrate merely that the information is "minimally relevant to the foreign proceeding." *Id.*

As a threshold requirement, to "serve as a proper predicate for a § 1782 petition" the proceeding for which the discovery is sought must be "adjudicative in nature." *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 27 (2d Cir. 1998). Courts have found proceedings to be nonadjudicative when the form of the proceeding is "inconsistent with the concept of impartial adjudication." *Fonseca v. Blumenthal*, 620 F.2d 322, 324 (2d Cir. 1980); *see In re Letters Rogatory Issued by Dir. of Inspection of Gov't of India*, 385 F.2d 1017, 1021 (2d Cir. 1967) (Friendly, J.) (stating that the concept of adjudication "is not so broad as to include all the plethora of administrators whose decisions affect private parties and who are not entitled to act arbitrarily, and one useful guideline is the absence of any degree of separation between the prosecutorial and adjudicative functions"). But when a proceeding involves a judge deciding contested legal or factual issues, it is generally understood to be adjudicative. *See Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 27 F.4th 136, 158 (2d Cir. 2022) ("determin[ing] the merits of a contention that an arbitral award should be vacated as fraudulently obtained, a recognized judicial function in this country as well as in the United Kingdom," is adjudicative); *In re YS GM Marfin II LLC*, 2022 WL 624291, at *6 (S.D.N.Y. Mar. 2, 2022) ("[T]he contemplated proceedings . . . will not be merely 'administrative,' as they will involve a court hearing or judicial review of a TPDO application."); *In re China Constr. Bank (Asia) Corp. Ltd.*, 2023 WL 3791711, at *1 (S.D.N.Y. June 2, 2023) ("the debtor examination will involve judicial factfinding," and is therefore adjudicative).

There must also be a "procedural mechanism by which the [applicant] may inject the discovery it seeks" into the foreign proceeding. *IJK Palm*, 33 F.4th at 680. This standard arises from the comity concerns upon which Section 1782 is based. "If a Section 1782 applicant is not a participant in a foreign proceeding and is not in a position to have a foreign tribunal consider the requested evidence, or if the sought-after information would be of no use in the foreign proceeding, there would be no need in the interests of comity for a United States court to lend its hand to an applicant to obtain evidence in the United States." *In re Ativos Especiais II - Fundo de Investimento em Direitos Creditorios - NP*, 2024 WL 4169550, at *4 (S.D.N.Y. Sept. 12, 2024) (citations omitted).

The Second Circuit has held that "a § 1782 application is moot when there are 'no foreign proceedings, within the meaning of the statute, in which the discovery could be used.'" *Mangouras*, 980 F.3d at 96 (quoting *Euromepa*, 154 F.3d at 29); *accord Accent Delight*, 869 F.3d at 128. However, the anticipated use of the discovery in a foreign proceeding need not be immediate. In *Intel*, the Supreme Court held that Section 1782 does not require that the underlying foreign proceeding be pending before a district court may authorize discovery. *Intel*, 542 U.S. at 259. Section 1782 requires only that the foreign proceeding be within "reasonable contemplation." *Id.* "In such early stages of pre-litigation, the foreign authority's jurisdiction may be an open question requiring jurisdictional discovery or alternatively may be answered by the defendant's consent only after discovery has taken place pursuant to Section 1782." *Navios*, 2025 WL 369717, at *5. However, "an 'applicant must have more than a subjective intent to undertake some legal action, and instead must provide some objective indicium that the action is being contemplated' such that 'proceedings will be instituted within a reasonable time.'" *Id.* at *2 (quoting *Certain Funds*, 798 F.3d at 123); *accord Mangouras*, 980 F.3d at 101. "At a

minimum, a § 1782 applicant must present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." *Certain Funds*, 798 F.3d at 123.  Further, "courts have denied applications where the applicant sought materials in order to 'investigate whether litigation is possible in the first place, putting the cart before the horse.'"  *Ativos Especiais II*, 2024 WL 4169550, at *5 (quoting *Certain Funds*, 2014 WL 3404955, at *6); *see In re China Constr. Bank*, 2023 WL 3791711, at *2 ("[C]ourts in this District have rejected Section 1782 applications when the petitioner sought discovery to determine whether to initiate a collection proceeding."); *Jiangsu Steamship Co. v. Success Superior Ltd*., 2015 WL 3439220, at *5 (S.D.N.Y. Feb. 5, 2015).

"Applicants bear the 'burden of establishing that they are in a position to use the evidence they seek through their § 1782 application in a foreign proceeding."  *Navios*, 2025 WL 887588, at *1 (quoting *Certain Funds*, 798 F.3d at 120) (alterations accepted).  "If an applicant's ability to initiate a proceeding in which the requested discovery may be used 'depends on some intervening event or decision,' the applicant must 'provide an objective basis on which to conclude that the event will occur or the requisite decision will be favorable.'"  *BonSens*, 95 F.4th at 80–81 (quoting *IJK Palm*, 33 F.4th at 680).  When an applicant must clear "a series of procedural hurdles" in order for the discovery to be usable, and the applicant has not provided an objective basis on which to believe it will do so, "it has not carried its burden to show that the suit is within reasonable contemplation."  *IJK Palm*, 33 F.4th at 680.  "If the applicant has not made a sufficient showing that the requested evidence would be 'of use' at the time the application is made and adjudicated, a party may file a new application once circumstances change."  *Ativos Especiais II*, 2024 WL 4169550, at *5 (citing *Mangouras*, 980 F.3d at 93); *In re*

*MT Baltic Soul Produktentankschiff-Ahrtsgesellschaft mgH & Co. KG*, 2015 WL 5824505, at *2 (S.D.N.Y. Oct. 6, 2015).

MML argues that the evidence sought is "for use in a foreign proceeding" because Villarán Bribery Case (30-2017), the Rutas Money Laundering Case (31-2017), and the Concession Contract Corruption Case (448-2017) are all proceeding before Peruvian National Courts of Preparatory Investigation, which qualify as "adjudicative in nature," Allemant I at ¶¶ 21–22, 24, 27, while the Brookfield Money Laundering Investigation, though not yet before a tribunal, qualifies as "within reasonable contemplation" of a proceeding pursuant to *Mees*, 793 F.3d at 299. Respondents do not dispute that the three matters proceeding before the National Courts of Preparatory Investigation are adjudicative in nature, arguing instead that the procedural posture of the two cases in the accusation stage practically bars the admission of new evidence. Dkt. No. 41 at 27–28. As to the Brookfield Money Laundering Investigation, they argue that the investigation is not "within reasonable contemplation" of a qualifying proceeding. *Id.* at 24–27.

Taking the last objection first, Respondents are correct that the Brookfield Money Laundering Investigation does not constitute a "foreign or international tribunal" for the purposes of Section 1782. It is undisputed that that matter is currently in the preliminary investigation stage, meaning that the investigation has been initiated by the *Ad Hoc* Prosecutor's Office after having met the required evidentiary threshold of "simple suspicion." Carrasco I ¶¶ 9–15; Caro I ¶¶ 8–10; Allemant I ¶ 9. In Peru, a criminal proceeding is not assigned to a judge until the preparatory investigation stage, Caro I ¶ 10; Carrasco I ¶ 12, and the *Ad Hoc* Prosecutor's Office is not akin to "an investigating magistrate or similar neutral adjudicator." *In re Application for an Ord. Seeking Discovery Under 28 U.S.C. § 1782*, 2024 WL 2883293, at *4–5 (S.D.N.Y. May 16. 2024); *Euromepa*, 154 F.3d at 27 (explaining that a tax assessment proceeding "was not a

24

proceeding before a 'tribunal' because the role of the government in the administrative proceeding was more akin to a prosecutorial decision to bring a case than to that of a neutral arbitrator"); Carrasco I ¶ 9; Caro I ¶¶ 8–10.

MML argues that the case is nonetheless "within reasonable contemplation" of a qualifying tribunal and should therefore qualify under *Mees*, 793 F.3d at 299. Dkt. No. 47 at 8–11. To be sufficiently "contemplated," however, MML must show "reliable indications of the likelihood" that the investigation will be brought before a qualifying tribunal "within a reasonable time." *Mangouras*, 980 F.3d at 100–01. "The prospective use of the evidence need not be imminent, but it cannot be 'merely speculative.'" *Ativos Especiais II*, 2024 WL 4169550, at *5 (quoting *BonSens*, 95 F.4th at 80–81). Critically, "'[i]f an applicant's ability to initiate a proceeding in which the requested discovery may be used 'depends on some intervening event or decision,' the applicant must 'provide an objective basis on which to conclude that the event will occur or the requisite decision will be favorable.'" *Id.*; *see also Klein*, 2023 WL 8827847, at *9 n.6 ("'[D]iscovery material is not "for use" in a foreign proceeding if it must first be used to persuade a third party'—here, the Brazilian criminal authorities—'to initiate that proceeding.'" (quoting *IJK Palm*, 33 F.4th at 678)); *Ativos Especiais II*, 2024 WL 4169550, at *8–9 (rejecting applicant's argument that proceeding was "within reasonable contemplation" where "parties' descriptions of the progress of the [contract enforcement proceeding] suggest that there [were] several 'procedural hurdles' still to come under Brazilian law before enforcement can occur").

It is not within MML's power to initiate a proceeding before a tribunal in the Brookfield Money Laundering Investigation—MML is instead reliant on the discretion of a third party, the *Ad Hoc* Prosecutor. MML has not established any objective basis on which to conclude that the *Ad Hoc* Prosecutor will ever issue a decision moving the case to the preparatory investigation

stage before a qualifying tribunal with the requisite "revealing suspicion" standard, Caro I ¶¶ 11–13, nor that such a decision would be made "within a reasonable time." As described above, the deadline for the *Ad Hoc* Prosecutor to determine whether the case would proceed to the preparatory investigation stage before a tribunal expired in April 2024. Carrasco I ¶ 16. On February 16, 2024, the prosecutor unilaterally extended that deadline by 36 months. *Id.* ¶ 17. Though Brookfield's Peruvian entities challenge to that unilateral extension was unsuccessful (and is now being appealed), the fact that the preliminary investigation stage was extended does not convey any certainty about when the proceeding might progress to the next stage, if it does at all. Accordingly, the Brookfield Money Laundering Investigation does not constitute a "foreign proceeding" for the purposes of Section 1782.

As to Respondents' claim that Section 1782 discovery would not be "for use" in the two proceedings that have progressed to the accusation stage (the Villarán Bribery Case (30-2017) and Rutas Money Laundering Case (31-2017)) because of the high threshold set for admitting new evidence at that stage, MML has the better of the argument. Respondents urge that new evidence may only be admitted in the accusation stage if it is deemed to be "supervening" evidence that a party could not have been aware of or that was impossible to obtain before the formal indictments were filed in 2022 and 2023. Caro I ¶ 21; Carrasco I ¶ 26. Brookfield's Peruvian counsel characterize this threshold as "extremely high," Carrasco I ¶ 26, and a "very exceptional circumstance," Caro I ¶ 20, but Respondents concede that the inadmissibility of the evidence in the foreign proceeding is not a statutory bar to § 1782 discovery. *See Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) (reversing district court ruling for "misconstru[ing] the 'for use' element of section 1782 as requiring [applicant] demonstrate that the discovery he seeks will be admitted in the [tribunal]"). "A foreign admissibility rule

would also serve 'only to thwart § 1782(a)'s objective to assist foreign tribunals in obtaining relevant information that the tribunals may find useful but, for reasons having no bearing on international comity, they cannot obtain under their own laws." *Id.* In any case, Respondents have not actually shown that such evidence could not be admitted, even if the bar for admission is high.

Respondents make no objection to MML's application to seek evidence "for use" in the fourth proceeding, the Concession Contract Corruption Case (448-2017). In short, apart from the above-identified deficiency in MML's status as an "interested person," MML's application for Section 1782 discovery would also fail the statutory requirement that it be sought "for use in a foreign proceeding" as to the Brookfield Money Laundering Investigation, but suffice as to the other three proceedings.

### G.    Residence in District

Section 1782 discovery may only be sought from a federal district court in "the district in which a person resides or is found." 28 U.S.C § 1782. Respondents dispute the Court's jurisdiction to order Section 1782 discovery upon only two out of three Brookfield entities, Brookfield Corporation and Brookfield Infrastructure Partners L.P. ("BIP"), arguing that neither "resides or is found" in this District. Under both the Second Circuit's causal nexus requirement set out in *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019) and the superseding Supreme Court decision in *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021), Respondents' opposition is well-founded.

In 2019, the Second Circuit held that Section 1782's "resides or is found" language does not require "physical presence" in a district, but rather "extends to the limits of personal jurisdiction consistent with due process." *del Valle Ruiz*, 939 F.3d at 528. "Personal jurisdiction takes two forms: general jurisdiction and specific jurisdiction." *Suez Water New York Inc. v. E.I.*

*du Pont de Nemours & Co*., 578 F. Supp. 3d 511, 527 (S.D.N.Y. 2022).  Because it is undisputed that this Court would not have general personal jurisdiction over Brookfield Corporation or BIP, only specific personal jurisdiction is at issue here.

Describing the limits of specific personal jurisdiction, the Second Circuit in *del Valle Ruiz* cited the familiar due process formulation, allowing § 1782 actions against non-parties to foreign proceeding to lie only if "the individual or entity has 'purposefully directed his activities at the forum and the litigation arises out of or relates to those activities," 939 F.3d at 529 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (cleaned up)), and if the assertion of personal jurisdiction would "comport with fair play and substantial justice," *id*. (quoting *Burger King*, 471 U.S. at 476).  Consistent with the Second Circuit's specific jurisdiction jurisprudence at the time, the *del Valle Ruiz* court reiterated that "we have always required some causal relationship between an entity's in-forum contacts and the proceeding at issue."  939 F.3d at 530.  "Translated to account for a § 1782 respondent's nonparty status," the Second Circuit held that "the respondent's having purposefully availed itself of the forum must be the primary or proximate reason that the evidence sought is available at all."  *Id.*  "[W]here the respondent's contacts are broader and more significant," a petitioner must still demonstrate "that the evidence sought would not be available *but for* the respondent's forum contacts."  *Id*. (emphasis added).

MML argues that the causal nexus requirement for specific personal jurisdiction set out in *del Valle Ruiz* was abrogated two years later by *Ford*, 592 U.S. 351.  The Supreme Court in *Ford* rejected any strict causal requirement read into the "arising out of or related to" language derived from *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).  *See Ford*, 592 U.S. at 352 (holding that the "causation-only approach finds no support in this Court's

requirement of a 'connection' between a plaintiff's suit and a defendant's activities"). Though the Second Circuit has recognized that *Ford* wrought a change in the formulation of specific jurisdiction, *see Lensky v. Turk Hava Yollari, A.O.*, 2023 WL 6173334, at *3 (2d Cir. Sept. 22, 2023) ("Especially after *Ford*, the fact that the plaintiffs were allegedly injured outside the United States cannot be the dispositive consideration in the specific jurisdiction analysis . . . ."), the Circuit has yet to elaborate a post-*Ford* standard for specific jurisdiction, let alone a post-*Ford* standard for construing "resides or is found" under Section 1782.

"It is well established that a district court must follow a precedential opinion of the Second Circuit unless and until it is overruled by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit." *See Loughlin v. Goord*, 558 F. Supp. 3d 126, 142 (S.D.N.Y. 2021), *aff'd*, 2022 WL 9575656 (2d Cir. Oct. 17, 2022) (cleaned up) (internal citations omitted). The Second Circuit has not yet overruled itself on *del Valle Ruiz*, and yet, following *Ford*, *del Valle Ruiz*'s first holding that "§ 1782's 'resides or is found' language extends to the limits of personal jurisdiction consistent with due process," 939 F.3d at 528, is clearly in tension with its other holding that "some causal relationship between an entity's in-forum contacts and the proceeding at issue" is required under Section 1782. *See id.* at 530. Both propositions can no longer be true.

The better reading of *del Valle Ruiz* is that the first holding survives the Supreme Court's decision in *Ford*, while the second does not.[7] The Second Circuit only stated that Section 1782

---

[7] One court in this District has reached a contrary conclusion, applying the causal nexus requirement of *del Valle Ruiz* post-*Ford*, but reaching the same conclusion under *Ford* in the alternative. *See Klein*, 2022 WL 1567584, at *6 ("[T]he Court is unaware of any authority in the Second Circuit that has revisited *del Valle Ruiz* since [*Ford*] issued. *del Valle Ruiz* was tailored to the forum contacts required to exercise specific jurisdiction over a section 1782 application, which involves different considerations than the products liability claims at issue in [*Ford*]. *del*

required a causal relationship between the entity's in-forum contacts and the proceeding at issue after concluding that Section 1782 reached the full extent of personal jurisdiction permitted under the Due Process clause.  The Circuit's latter conclusion was rooted in its interpretation of Section 1782, in its conclusion that it was consistent with "Congress's intent that § 1782 be interpreted broadly," and in its reading of prior caselaw.  *del Valle Ruize*, 939 F.3d at 528 (internal citations omitted).  The prior caselaw had emphasized the value of interpreting Section 1782, "which is simply a discovery mechanism and does not subject a person to liability," in accord with the "well-settled case law on territorial jurisdiction."  *In re Edelman*, 295 F.3d 171, 179 (2d Cir. 2002).  The *del Valle Ruiz* Court recognized that "the use of terminology relating to causation [wa]s a somewhat awkward fit for discovery."  939 F.3d at 530 n.12.  It arrived at the formulation seemingly reluctantly and only because it was "a workable translation of the normal personal-jurisdiction framework."  *Id.*  Though it may be of limited doctrinal significance, the Circuit repeated its interpretation that Section 1782 extended to the limits of due process three times in the opinion,  *see* 939 F.3d at 523–24, 528, 534, while mentioning the causal nexus requirement only once, *see id.* at 530.  It appears unexceptionable that after *Ford*, the Second

---

*Valle Ruiz* continues to govern the analysis of specific jurisdiction over a section 1782 application in the Second Circuit. Applying *del Valle Ruiz*, the applicants have not explained how the forum contacts of [respondents] are either a but-for or proximate cause of the materials that they seek."). Another court in this District recognized the question raised by *Ford* in the 1782 context but elided the question as the applicant failed under both standards. *See In re Litasco SA*, 2023 WL 8700957, at *2 (S.D.N.Y. Dec. 15, 2023) ("Other § 1782 applicants have argued that the Supreme Court's decision in [*Ford*], implicitly abrogated [*del Valle Ruiz*]. [Applicant], however, has not made that argument, so this Court need not consider it."). Various other courts in this District have continued to apply the causal nexus requirement in the Section 1782 context post-*Ford*, but without discussion or analysis of the effect of *Ford*. *See e.g., Matter of Hranov*, 2022 WL 1261827, at *5 (S.D.N.Y. Apr. 28, 2022); *In re Steinmetz*, 2022WL 170851, at *4 (S.D.N.Y. Jan. 19, 2022); *In re Ibiuna Credito Gestao de Recursos Ltda.*, 2024 WL 1077559, at *6 (Feb. 14, 2024); *In re West African Mineral Trading Ltd.*, 2024 WL 3862293, at *3 (S.D.N.Y. Aug. 19, 2024).

Circuit's precedents requiring a causal nexus in the context of specific personal jurisdiction can no longer stand. Now that the "normal personal-jurisdiction framework" no longer requires causation, it cannot be that the Circuit will require causation to establish the residence requirement for Section 1782. There would therefore be no need for this Court to require a Section 1782 applicant to show causation before obtaining the more limited relief of discovery.

Abrogating a causal nexus between the entity's in-forum contacts and the Section 1782 discovery sought critically "does not mean anything goes. In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Ford*, 592 U.S. at 362. "Under *Ford*, specific personal jurisdiction still requires a 'relationship among the defendant, the forum, and the litigation,' or stated alternatively, a 'connection between the plaintiffs' claims and defendant's activities in those states." *Bah v. Apple Inc*., 2021 WL 4894677, at *2 (S.D.N.Y. July 26, 2021) (quoting *Ford*, 592 U.S. at 369, 371) (cleaned up); *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 179 (S.D.N.Y. 2021) ("In other words, while it is not necessary that the contacts be causally related to a claimant's claims, they still must be related to these claims in some less than trivial way if the words 'relate to' are to have any real meaning.").

*Ford*'s requirements for exercising specific personal jurisdiction have not been met here for Brookfield Corporation or BIP.

### 1.    Brookfield Corporation

Brookfield Corporation is a company organized under the laws of Ontario, Canada, and headquartered in Toronto, Canada. Dkt. No. 43 ("Vaughan Decl.") ¶ 5. It is a publicly traded global investment firm listed on the New York Stock Exchange and Toronto Stock Exchange. *Id.* Brookfield Corporation has an office in New York with a limited staff of 34 employees whose roles are limited to either supporting listed issuer work or performing certain back-office

31

functions. *Id.* ¶ 6. That New York office is one of eight "corporate offices" listed on Brookfield's website. Dkt. No. 4-94. MML asserts, and Brookfield does not dispute, that "multiple" Brookfield Corporation board members are "based in New York," Dkt. No. 3 at 29, Dkt. No. 41 at 44, though the actual exhibit that MML cites in evidence, the roster of Brookfield Corporation board members, does not appear to contain any information respecting the residences or places of work of the fourteen board members, *see* Dkt. No. 4-95. According to the March 2024 Brookfield Code of Business Conduct and Ethics, the Board of Directors of Brookfield Corporation "reviews and approves the Code on at least an annual basis and is ultimately responsible for monitoring compliance with the Code." Dkt. No. 4-87 at 20. The Code incorporates the company's "Anti-Bribery and Corruption Policy" and prohibits bribery or any activity that facilitates any criminal activities. *Id.* at 5, 16–17. BIP is one of the entities covered by the Code. *Id.* at 5.

MML seeks discovery concerning Brookfield Corporation's due diligence policies and implementation as it relates to BIP's acquisition of a majority stake in Rutas in 2016. Dkt. No. 3 at 29. MML argues that because there are multiple board members in New York and that same board reviews and approves the company's Code of Business Conduct and Ethics, Brookfield Corporation's contacts with this district "directly relate[] to the discovery sought in this District, which concerns how Brookfield addressed anti-bribery and corruption issues in its acquisition of Rutas." Dkt. No. 47 at 14. MML argues that there is a "relationship among the defendant, the forum, and the" discovery sought, *Ford*, 592 U.S. at 365, not merely because Brookfield Corporation selected board members who reside in New York but because of "what Brookfield purposefully had those members *do* while based in New York—approve and monitor compliance

with Brookfield's Code of Business Conduct and Ethics, which is directly implicated in the discovery sought." Dkt. No. 47 at 15 (emphasis in the original).

MML's argument with respect to Brookfield is unavailing. Under both the causal nexus standard of *del Valle Ruiz* and under *Ford*, the court in *In re Klein* rejected the applicant's claim of specific jurisdiction based on a non-resident discovery target's maintenance of a Manhattan office and the fact that it was traded on the New York Stock Exchange, concluding that such contacts "fall short of the 'veritable truckload of contacts with Montana and Minnesota' described in *Ford*." 2022 WL 1567584, at *6; *see also In re Litasco SA*, 2023 WL 8700957, at *2 (rejecting application under *Ford* standard where "at most, [applicant's] submissions suggest that [respondents] have rented office space in Manhattan"). Applicants in that case made "no showing about the types of services they provide in this district, their marketing activities, or other indicia of purposeful availment that would give them clear notice that they could be required to respond to the applicants' subpoenas." *Id.* Likewise, Brookfield Corporation's small office in Manhattan, housing employees with limited back office functions, and listing on the NYSE, are insufficient to show purposeful availment of New York as a forum. *See also Jihshyr Yih v. Taiwan Semiconductor Mfg. Co.*, 815 F. App'x 571, 573 (2d Cir. 2020) ("New York law 'accords foreign corporations substantial latitude to list their securities on New York-based stock exchanges and to take the steps necessary to facilitate those listings . . . without thereby subjecting themselves to New York jurisdiction for unrelated occurrences.'"). As to the presence of board members in New York and their involvement in reviewing, approving, and monitoring compliance with the Code of Conduct governing BIP, the discovery sought is simply too attenuated from Brookfield Corporation's actions in New York. The fact that some unspecified number of board members lives in New York does not, for instance, establish that the Board ever

met in or conducted any of its business New York, let alone business related to the Code of Conduct and its review and enforcement. In sum, "while it is not necessary that [Brookfield Corporation's] contacts be causally related to [the discovery sought], they still must be related to these claims in some less than trivial way if the words 'relate to' are to have any real meaning." *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 179 (S.D.N.Y. 2021).

### 2.    BIP

BIP is a limited partnership existing under the laws of and headquartered in Bermuda. Vaughan Decl. ¶ 10; Dkt. No. 37 (Brookfield Rule 7.1 Disclosure). BIP is majority publicly owned. Vaughan Decl. ¶ 10. Affiliates of Brookfield Corporation own more than 10% of Brookfield Infrastructure Partners L.P.'s stock (on a fully diluted basis). Dkt. No 37.

MML argues that BIP should be considered to reside in or be found in this District because BIP, "through its due diligence processes, purposefully engaged with entities, resources, and personnel in this District, including Brookfield Corporation and Cahill, to evaluate its purchase of a majority stake in Rutas." Dkt. No. 4-64 (June 30, 2021, Witness Declaration of Benjamin Vaughan) ¶¶ 39, 48. MML leans heavily on the fact that BIP engaged Cahill, an undisputedly New York-based law firm, *see* Dkt. No. 4-93, to conduct the anti-bribery and corruption due diligence process for the Rutas acquisition, including reviewing documents, testing transactions, questioning and interviewing witnesses, and performing background checks. Dkt. No. 4-64 ¶ 42. However, while Cahill may be located in New York, the individuals who actually conducted the due diligence were employed by individuals employed outside of the United States and the due diligence work was performed outside the United States. *See* Vaughan Decl. ¶¶ 15–16 ("All the individuals at Brookfield entities that participated in the due diligence and acquisition of Rutas de Lima were employed by non-U.S. entities and operated out of either Peru or Canada. No meetings associated with the Rutas de Lima due diligence and acquisition

took place in New York or elsewhere in the United States. The investment decision for BIP to participate in the Rutas acquisition was made in Bermuda. . . I confirm that none of the meetings relating to the Rutas de Lima due diligence between BIP and Cahill took place in New York or elsewhere in the United States.").  As MML points out, the fact that no meetings took place in New York does not mean that Cahill did not conduct legal work relating to the due diligence in New York.  Dkt. No. 47 at 16.  But the fact that BIP hired a New York-based law firm to conduct legal work in service of an acquisition in another country does not suffice to show that BIP purposefully availed itself of New York as a forum, nor to raise a reasonable expectation on BIP's part of being haled into a New York court.  *Orlando v. Nxt-ID, Inc.* is directly on point: "hiring an attorney who happens to be based in New York, but who could have performed the same services from an office somewhere else, by itself, is not enough for personal jurisdiction under [New York's long-arm statute]."  2021 WL 1143766, at *10 (S.D.N.Y. Mar. 23, 2021); *see also PaineWebber Inc. v. Westgate Grp., Inc.*, 748 F. Supp. 115, 120 (S.D.N.Y. 1990) ("'Get me a New York lawyer,' without more, is not an invocation of in personam jurisdiction in the forum state of the lawyer's practice.").  Though these cases predate *Ford*, the proposition they rely upon is not dependent upon causation.  MML's cited cases do nothing to undermine this result, as both are fee disputes between New York lawyers and their out-of-state clients, disputes in which parties should very reasonably expect to be haled into a New York court if they failed to pay their New York lawyer.  *See Pennie & Edmonds v. Austad Co.*, 681 F. Supp. 1074, 1078 (S.D.N.Y. 1988); *Fischbarg v. Doucet*, 832 N.Y.S.2d 164, 167–169 (N.Y. App. Div., 1st Dept. 2007).  The subpoena to Brookfield (which encompasses all three Brookfield entities, including BIP) seeks information concerning events, decisions, and communications made in relation to an investment in Rutas, a Peruvian consortium owned by a Brazilian parent company.  Dkt. No. 4-1.

BIP's decision to engage a New York law firm in relation to that foreign transaction does not suffice for a "relationship among the defendant, the forum, and the" discovery sought, *Ford*, 592 U.S. at 365, because MML has offered no evidence to suggest that as to BIP's engagement of Cahill as its agent in relation to the Rutas transaction, Cahill's location in New York is anything but incidental to these foreign events.  MML offers no evidence that BIP engaged Cahill's expertise in relation to a transaction or assets in New York, for questions of New York law, or for goods or services ultimately directed to New York residents or markets.  Put another way, MML has not established that by hiring Cahill, BIP  "continuously and deliberately exploited a State's market" or that such decision shows that BIP's "business deliberately extended" into New York.  *Ford*, 592 U.S. at 363–64.

MML also argues that Brookfield Corporation's overarching control and Brookfield Asset Management's management of BIP "establishes a substantial connection to this District" because  "Brookfield Corporation's and New BAM's oversight influences Brookfield Infrastructure's practices and investments to align with U.S. standards and investor expectations, as Brookfield Corporation's U.S.-based policies and resources directly affected Brookfield Infrastructure's risk assessments and due diligence of Rutas."  Dkt. No. 3 at 30.  MML's theory of specific personal jurisdiction as to BIP boils down to an impermissible attempt to impute forum contacts of other Brookfield entities to BIP—Brookfield Corporation, which, as set out above, is also not resident or found in this jurisdiction, and Brookfield Asset Management, which is undisputedly resident in New York because it is headquartered there, *see* Dkt. No. 4-90 ("BAM has now changed its head office to New York").  MML has neither established nor attempted to establish that these entities are alter egos or agents of BIP.  *See In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 274 (2d Cir. 2023) ("The alter-ego theory provides for

personal jurisdiction if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." (quoting *Indah v. SEC*, 661 F.3d 914, 921 (6th Cir. 2011)), *cert. denied sub nom. BASF Metals Ltd. v. KPFF Inv., Inc.*, 144 S. Ct. 681 (2024)); *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 126 (2d Cir. 2023) (describing the elements of the agency theory of personal jurisdiction over co-conspirators).  Specific personal jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum, and must be analyzed with regard to the defendant's contacts with the forum itself, not with persons residing there." *Walden v. Fiore*, 571 U.S. 277, 277 (2014) (emphasis in original); *see also Franklin v. Coloplast Corp.*, 2019 WL 5307085, at *4 (N.D.N.Y. Oct. 21, 2019) ("[Plaintiff] has not shown that the subsidiary is an agent or a mere department of the parent, and the parent can only be subjected to this Court's personal jurisdiction if its own choices and contacts allow for it.").

In conclusion, neither Brookfield Corporation nor BIP reside in or may be found in this District within the meaning of Section 1782, and the discovery requests issued to these two entities must accordingly be quashed.

### 3.    Jurisdictional Discovery

MML's request for jurisdictional discovery is denied.  While jurisdictional discovery is discretionary, "if the plaintiff has failed to establish a prima facie case for personal jurisdiction, jurisdictional discovery is generally not granted." *Long Side Ventures LLC v. Hempacco Co.*, 2023 WL 6386888, at *13 (S.D.N.Y. Sep. 29, 2023) (quoting *RSM Prod. Corp. v. Fridman*, 643 F.Supp.2d 382, 402 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010)).  MML has not made such a prima facie case, nor demonstrated a "genuine issue of jurisdictional fact" beyond the conclusory basis set out in its application.  *See In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 812 (S.D.N.Y. 2005).  Because the subpoenas must be quashed regardless

because MML has failed to meet the statutory "interested person" requirement, jurisdictional

discovery would be futile.

## CONCLUSION

Respondents' motion to quash the subpoenas is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. No. 32, 38, 44.

SO ORDERED.

Dated: May 27, 2025
New York, New York                           _____
                                                          LEWIS J. LIMAN
                                                  United States District Judge